COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES *v.* CITY
OF HARTFORD ET AL.
(AC 32894)

DiPentima, C. J., and Beach and Sheldon, Js.

142

Argued November 29, 2011—officially released September 18, 2012

*Helen Apostolidis*, for the appellant (named defendant).

*David L. Kent*, human rights attorney, for the appellee (plaintiff).

*Jamie L. Mills*, for the appellee (plaintiff Dana Peterson).

*Charles Krich,* principal attorney, filed a brief for the appellee (defendant commission on human rights and opportunities).

*Jennifer L. Levi* filed a brief for the Transgender Rights Project of Gay & Lesbian Advocates & Defenders as amicus curiae.

*Opinion*

BEACH, J. The defendant city of Hartford[1] appeals from the judgment of the trial court rendered in favor of the plaintiffs, Dana Peterson and the commission on human rights and opportunities (commission),[2] reversing the decision of the commission's human rights referee (referee) and remanding the case on various grounds to the referee for further proceedings. The defendant claims that the court erred in denying its motion to dismiss and in subsequently reversing the decision and remanding the case to the referee on the issues of pretext, physical disability, gender stereotyping and retaliation. We reverse the judgment of the trial court.

On August 6, 2003, Peterson filed a complaint with the commission alleging that the Hartford police department (department) discriminated against her on the

[1] The commission on human rights and opportunities (commission), in its decision-making capacity, was also named as a defendant. The commission's decision-making division declined to defend the appeal in the trial court and joined the plaintiffs. See General Statutes § 46a-94. We therefore refer in this opinion to the city of Hartford as the defendant.

The commission appealed the referee's decision on behalf of Peterson, and she later moved to be made a party plaintiff.

[2] The commission acts in a dual role of protecting the public interest and the private complainant. *Commission on Human Rights & Opportunities* v. *Board of Education,* 270 Conn. 665, 683, 855 A.2d 212 (2004). Although the primary role of the commission is to enforce statutes barring discrimination and it has an institutional interest in its decision-making process, the commission also is empowered by statute to prosecute complaints on issues of public concern. Id., 682–83; see also General Statutes § 46a-94a (a) (empowering commission to appeal from decisions of administrative referees within agency in accordance with General Statutes § 4-183 [a]).

basis of her sex (female) and disability (transsexual and gender dysphoria) during the process of selecting trainees for the position of patrol canine handler, in violation of the Connecticut Fair Employment Practices Act, General Statutes §§ 46a-60 (a) (1) and 46a-58 (a). On October 15, 2003, she amended her complaint to allege retaliation in violation of § 46a-60 (a) (4).

The commission certified the complaint for a public hearing. Following a public hearing, the referee issued a memorandum of decision on November 14, 2008. The referee set forth the following relevant findings of fact. Peterson was born a biological male in 1967. After years of turmoil regarding her then anatomical sex and after seeking assistance from mental health professionals, Peterson began living as a woman in 1991. In 1993, Peterson underwent sex reassignment surgery in Canada. Also in 1993, Peterson applied for a position as a police officer with the department. After completing the requisite training, Peterson was sworn in as a police officer with the department in 1994 and was promoted to the rank of sergeant on July 31, 2004.

Peterson has had the career goal of becoming a patrol canine handler. The department did not train canine handlers itself; training was provided by a state operated canine training academy (academy). In 2002, Neville Brooks, a sergeant with the department, was appointed to the position of supervisor of the department's patrol canine unit. In that position, Brooks was responsible for the selection of officers for the canine unit. Brooks created an interdepartmental memorandum, dated May 13, 2002, expressing the department's intention to fill certain canine handler positions. The memorandum stated that the selection process entailed a letter of recommendation from an immediate supervisor, a physical agility test based on the "Cooper Standards," a review of lost time and disciplinary action, an interview with family members, an inspection of

residence and successful completion of a sixteen week training class. The Cooper Standards are physical agility fitness norms.[3] Passing a physical agility test administered by the academy had been a requirement of becoming a member of the department's canine unit since at least August 9, 1999.

Seven officers, including Peterson, responded to the May 13, 2002 announcement. It was the custom of the department to select for academy training one more person than the number of positions available to the department in the academy's training class so that an alternate could be trained if one of the others failed initial testing at the academy. Brooks selected three officers; Peterson was not included. The three officers selected by Brooks were given a physical agility test by the academy on December 30, 2002; all three officers failed. As a result of their failure, Brooks decided to administer his own physical agility test to all officers who applied to become patrol canine handlers in order to avoid the embarrassment of officers' failure to pass the academy's physical agility test and to avoid losing positions allocated to the department in the academy's sixteen week training class for canine handlers.

By interdepartmental memorandum dated January 6, 2003, Brooks again announced that the department was seeking to send candidates for the position of patrol canine handler to the academy. The memorandum indicated that the selection process would include two

---

[3] The referee noted that the Cooper Standards/physical agility fitness norms have been defined as standards "based on a representative sample of approximately 4000 officers that were stratified (by age and gender) and randomly selected from forty municipal, state and federal agencies. 89.7 [percent] of the sample was male and 10.3 [percent] of the sample was female; which reflects the gender characteristics of most agencies. The physical fitness tests were field tests measuring those job related physical fitness areas that have been shown to be the underlying and predictive factors for officer physical abilities to perform essential physical tasks and functions of the job."

physical agility tests: one conducted in advance by the department and the other conducted by the academy. Although Peterson did not respond to the announcement, she nonetheless was invited to participate in the January physical agility test conducted by the department.

On January 26, 2003, Brooks conducted a physical agility test. Brooks tried to duplicate the test used by the academy. He contacted the academy and was provided with the events and scoring standards. The events included a 300 meter run for which the scoring standards did not differentiate by gender or age. Using these standards to score the January, 2003 test, Brooks determined that Peterson had failed the 300 meter run.

After being informed of this result, Peterson contacted the department's police academy and spoke with Dave Dufault, a Cooper Standards certified instructor,[4] who provided her with a different version of the Cooper Standards for the 300 meter run that varied by gender and age. On February 21, 2003, Peterson's union filed a grievance with the department regarding her failing the department's January 26, 2003 physical agility test.

The two candidates who passed the department's physical agility test were sent to the academy for physical agility testing. One candidate, Robert Lawlor, withdrew from the academy's canine training class because his dog had been found to be unsuitable. As a result of Lawlor's withdrawal, Brooks requested, and the department was allotted, a slot in the September, 2003 session of the academy.

By interdepartmental memorandum dated August 28, 2003, Brooks again announced that the department was seeking candidates for the position of patrol canine

---

[4] To become a certified instructor, Dufault was required to attend a sixty hour course conducted by the Cooper Institute.

handler. Peterson responded to this announcement. On September 7, 2003, the department conducted a physical agility test to screen the applicants. Brooks requested that Dufault administer the physical agility test. Dufault was not assigned the additional task of determining whether a candidate passed or failed the test. Peterson, along with four other candidates, passed the physical agility test. The department had been allotted one slot in the academy class, and Brooks again decided to send one more candidate for preliminary testing at the academy than the number of slots available to the department in the training class. Brooks ranked the candidates according to performance on the physical agility test, and Peterson, who ranked last, was not selected.

The referee rejected Peterson's claims of discrimination and retaliation and dismissed the complaint. The commission appealed from the referee's decision to the Superior Court pursuant to General Statutes §§ 46a-94a[5] and 4-183.[6] Thereafter, Peterson filed a motion to be made a party plaintiff, which was granted by the trial court. On May 4, 2010, the court remanded the matter to the commission for clarification of three points. After the referee filed his response to the remand order, the defendant filed a motion to dismiss the action for lack of subject matter jurisdiction. The defendant claimed that the remand order of May 4, 2010, was a final judgment and further action in the same appeal was thus impossible. The court denied the motion to dismiss.

---

[5] General Statutes § 46a-94a (a) provides in relevant part: "The Commission on Human Rights and Opportunities, any respondent or any complainant aggrieved by a final order of a presiding officer . . . may appeal therefrom in accordance with section 4-183. . . ."

[6] General Statutes § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

In a memorandum of decision issued on October 27, 2010, the court sustained the appeal. The court found that the referee erred by inadequately discussing the issue of pretext and improperly concluding that Peterson could not bring a complaint for physical disability discrimination and that the protected activity relevant to her retaliation claim was limited to the filing of the August, 2003 commission complaint. The court remanded the matter to the referee for further proceedings based on the existing record. This appeal followed.[7]

We first set forth our standard of review. "Our review of an agency's factual determination is constrained by . . . § 4-183 (j), which mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . . This limited standard of review dictates that, [w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the [party challenging the agency's decision] to demonstrate that the

---

[7] This court granted the application of the Transgender Rights Project of Gay & Lesbian Advocates & Defenders to file an amicus curiae brief.

[agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . . With respect to questions of law, [w]e have said that [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citation omitted; internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 503–504, 832 A.2d 660 (2003).

I

The defendant first claims that the court erred in denying its motion to dismiss. The defendant argued in the motion that the court's first remand effectively was a final judgment and that the court had no jurisdiction to hear the matter subsequently. We disagree.

We first set forth our standard of review. "A motion to dismiss . . . properly attacks the jurisdiction of the court . . . . [O]ur review of the trial court's ultimate legal conclusion and resulting [decision to deny] . . . the motion to dismiss will be de novo." (Internal quotation marks omitted.) *Columbia Air Services, Inc.* v. *Dept. of Transportation*, 293 Conn. 342, 346–47, 977 A.2d 636 (2009).

At oral argument on March 25, 2010, the trial court sua sponte raised issues regarding the clarity of the referee's decision. On April 1, 2010, the court issued an order permitting the parties to file briefs before it considered a remand for clarification. On May 4, 2010, the court issued an order remanding the matter to the referee "to issue a clarification" in accordance with the March 25, 2010 transcript of the trial court's proceedings. On May 14, 2010, the defendant filed a motion requesting that the court issue a clarification of its May 4, 2010 remand order. On May 17, 2010, the court issued

a clarification that specified three points for the referee to clarify. On June 23, 2010, the referee filed a response to the court's remand order in which it addressed the three points. The defendant filed a motion to dismiss the action for lack of subject matter jurisdiction. In its memorandum in support of its motion to dismiss, the defendant argued that the court's May 4, 2010 remand order was a final judgment pursuant to § 4-183 (j), and, thus that the court's jurisdiction over the matter had terminated. Following argument on the matter, the court denied the motion on the reasoning that the prior remand was solely for clarification and not a determination of the merits.

If the May 4, 2010 order was a final judgment for the purpose of appeal, then further substantive rulings would generally be inappropriate, but if the remand order was simply requesting clarification, the court later properly considered the merits of the administrative appeal. Section 4-183, which governs appeals under the Uniform Administrative Procedure Act, contains two subsections, (h) and (j), that specifically concern remands. The defendant argues that the court's May 4, 2010 remand order was not issued pursuant to subsection (h). Remand orders issued pursuant to subsection (h) are not final judgments. "Subsection (h) permits the trial court, prior to a hearing on the merits and upon request of a party, to order that the additional evidence be taken before the agency, which in turn allows the agency to modify its findings or decision." (Internal quotation marks omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 558, 964 A.2d 1213 (2009). We agree that the remand order was not issued under subsection (h).

The defendant argues that, because the remand order was not one authorized by subsection (h), it must have been authorized by subsection (j). A remand issued by the trial court pursuant to § 4-183 (j) constitutes a final

judgment for the purpose of appeal irrespective of the nature of the remand and administrative proceedings that are expected to follow it. See *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 675, 855 A.2d 212 (2004). The defendant argues, accordingly, that, because the remand order was a final judgment, the order terminated the proceedings before the trial court, and thus terminated its jurisdiction over the case. We disagree and conclude that the court's remand order was not issued pursuant to § 4-183 (j).

Section 4-183 (j) provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment."

In its May 17, 2010 clarification of its May 4, 2010 remand order, the court ordered the referee to clarify three points: "1. Was the issue of 'mixed motive' discussed in the referee's opinion as regards [Peterson]? . . . There appears to be a 'not' missing . . . as regards the referee's statement comparing *Conway* [v. *Hartford*, Superior Court, judicial district of Hartford,

Docket No. CV-95-0553003 (February 4, 1997) (19 Conn. L. Rptr. 109)], to the present case. Did the referee conclude that *Conway* was, or was not, controlling? 3. Did the referee discuss the February, 2003 incident, as the October, 2003 affidavit did not supplant, but only supplemented, the August, 2003 affidavit? . . ." (Citations omitted.) The court also noted in a footnote that there was a typographical error on page thirty-seven of the referee's decision.

The May 4, 2010 remand order was not issued under subsection (j). In the clarification of its remand order, the court did not find that the "substantial rights of the person appealing" had been prejudiced as a result of one or more of the errors enumerated in § 4-183 (j), nor does the remand functionally affect substantial rights. Parenthetically, at the March 25, 2010 hearing, the court indicated its intention to retain jurisdiction: "I'm really thinking that this decision has to be clarified so that we know what we're dealing with. . . . [I]f [the referee] wants to put an amended decision in, then come back here, and we'll take a look at it."

The defendant is incorrect in its position that if a court remands a matter to an agency, that remand must necessarily be governed by either subsection (h) or subsection (j). Although the plain text of § 4-183 expressly refers to remands only in subsection (j) and implicitly refers to remands in subsection (h),[8] it does not state that the types of remands addressed in § 4-183 constitute an exhaustive list despite the legislature's knowledge of how to express such an intent. See *Vincent v. New Haven*, 285 Conn. 778, 789, 941 A.2d 932 (2008). Reviewing courts typically have the ability to

---

[8] Our Supreme Court has stated that orders under subsection (h) of § 4-183 "fairly may be characterized as remands." *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 558.

obtain articulations from the tribunals whose decisions they review.[9]

In *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 558 n.7, our Supreme Court, determining that the remand order at issue in that case properly was rendered under § 4-183 (j), reasoned that "[t]he remand cannot be characterized as ordering an articulation, *which would fall outside the scope of § 4-183 altogether* . . . ." (Emphasis added.) In the present case, the May 4, 2010 remand order is not within the scope of § 4-183, can properly be characterized as a request for an articulation and, therefore, was not a final judgment. Accordingly, we conclude that the trial court properly denied the defendant's motion to dismiss. Having determined that the first remand order was not a final judgment, we turn to the defendant's remaining claims, which concern the merits of the second remand order in the court's October 27, 2010 judgment.

II

The defendant claims that the trial court erred in reversing the decision of the referee and remanding the discrimination claim to the referee on the issue of pretext. We agree.

The referee analyzed Peterson's discrimination claim using the pretext model articulated in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[10] In order to set forth a prima facie

---

[9] For example, Practice Book § 60-5 provides for remands by appellate courts "for a further articulation of the basis of the trial court's factual findings or decision." By analogy, a trial court hearing administrative appeals has the same power, which sometimes is necessary to reach a reasoned and informed decision.

[10] "The United States Supreme Court has set forth three theories of discrimination, each of which requires a different prima facie case and corresponding burden of proof. These theories are: (1) the [pretext] theory. . . (2) the disparate impact theory . . . and (3) the [mixed motives] theory." (Citations omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Sullivan*, 285 Conn. 208, 225–26, 939 A.2d 541 (2008).

case of discrimination under the pretext model, a plaintiff must establish that she: "(1) is a member of a protected class; (2) applied for and was qualified for the benefit or position; (3) suffered an adverse action by the defendant; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Commission on Human Rights & Opportunities* v. *Sullivan*, 285 Conn. 208, 227, 939 A.2d 541 (2008), citing *McDonnell Douglas Corp.* v. *Green*, supra, 802.

"Under [the burden shifting] analysis [of *McDonnell Douglas Corp.*], the employee must first make a prima facie case of discrimination. The employer may then rebut the prima facie case by stating a legitimate, non-discriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." (Internal quotation marks omitted.) *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 220, 928 A.2d 586 (2007), aff'd, 289 Conn. 57, 956 A.2d 579 (2008).

The referee determined that Peterson was "a member of a protected class by virtue of her gender (female); that she suffered an adverse employment action; and that the decision not to pass [Peterson] on the January 2003 . . . physical agility test gives rise to an inference of discrimination." The referee found, however, that Peterson had not established a prima facie case of discrimination because she had not proven that she was qualified for the position as a result of her having not passed the department's physical agility test. The referee also found, in the alternative, that even assuming Peterson had established a prima facie case, she could not prevail because the defendant had produced a legitimate business reason for the adverse employment decision, and Peterson had failed to prove that reason to be a pretext for discrimination.

With respect to the September, 2003 selection process, the referee found that Peterson had established a prima facie case because, having passed the preliminary tests, she was qualified for the position. The referee determined, however, that Peterson had not proven by a preponderance of the evidence that the reason proffered by the defendant for why she was not selected was a pretext for discrimination actually resulting from discriminatory animus on the part of Brooks.

The court determined that the referee's findings regarding the business justification and pretext were unclear and required further elaboration. The court further stated that the referee failed to consider evidence of a discriminatory environment and that such evidence properly should be considered when evaluating the issue of pretext.

The defendant argues on appeal that the court erred in reversing the decision and remanding the case to the referee on the basis that the referee's discussion of pretext was inadequate and that the referee failed to address additional evidence of discrimination. The defendant maintains that, because there was substantial evidence to support the referee's decision on the issue of pretext, it was error for the court not to sustain the decision. In its brief, the commission argues that the court's decision to remand the case on the issue of pretext was proper because the referee committed legal error by failing to consider adequately all probative evidence on the issue of pretext. We agree with the defendant.

"Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedure Act, General Statutes § 4-166 et seq.] . . . and the scope of that review is very restricted. . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably,

arbitrarily, illegally, or in abuse of its discretion. . . . In order for a reviewing court to reverse or modify an agency's decision . . . § 4-183 (g) (1) [now subsection (j)] requires the court to find that substantial rights of the appellant have been prejudiced." (Citation omitted; internal quotation marks omitted.) *Sgritta* v. *Commissioner of Public Health*, 133 Conn. App. 710, 715, 37 A.3d 774, cert. denied, 305 Conn. 906, 44 A.3d 182 (2012).

The trial court concluded that the referee did not consider all the evidence before him, in particular, evidence of a discriminatory environment, when making his decision. There is, however, nothing in the record to justify this conclusion. We presume that the referee considered all the evidence before him in arriving at his decision. See *Bancroft* v. *Commissioner of Motor Vehicles*, 48 Conn. App. 391, 404, 710 A.2d 807, cert. denied, 245 Conn. 917, 717 A.2d 234 (1998).

In support of its conclusion that the referee failed to consider evidence of a discriminatory environment—more specifically, several instances of uncivil and demeaning behavior—when making his determination on pretext, the court highlighted a footnote in the referee's decision, which stated: "While [Peterson] testified to these unpleasant instances the pending complaint does not include these. It is important to note that [Peterson] has not made a claim of a hostile work environment which could have made these experiences relevant." This footnote, which was made in the context of the referee's statement of the parties' positions, simply states that a hostile work environment claim per se was not before the referee. It does not necessarily mean that the referee considered evidence of her environment to be irrelevant for the purpose of context or background when analyzing Peterson's claim of discrimination. The referee included in his findings of fact

"unpleasant instances" of discriminatory treatment.[11] These facts were found without any indication that the referee deemed them irrelevant.

The referee also made findings regarding Brooks' use of the "single norm" Cooper Standards in evaluating the January test. The referee found that "Brooks had no preference as to what standard was utilized for the 300 meter event other than to use what the [academy] used so that the [department's] physical assessment 'mirrored' exactly what the [academy] did." The fact that the referee included findings regarding the discriminatory environment and also made findings supporting his conclusion that Peterson failed to prove that the legitimate business reason presented by the defendant was a pretext indicates that the referee did consider the work environment.

Applying our highly deferential standard of review, we determine that the referee's conclusions regarding pretext were supported by substantial evidence. With respect to the January-February, 2003 selection process, the referee found that Peterson failed to meet her burden of proving a prima facie case of discrimination under the *McDonnell Douglas Corp.* test because she failed to show that she was qualified for the position of patrol canine handler.[12] The referee also found that even if Peterson had established a prima facie case, the defendant met the burden of producing a legitimate business reason, and Peterson had failed to prove that that reason was a pretext for discrimination.

The referee's factual findings support a conclusion that Peterson did not set forth a prima facie case of

[11] Although the referee found that, over a period of years, several specific insulting and demeaning events had occurred, we see no useful purpose in reciting the details here.

[12] Although not explicitly stated by the referee, this conclusion clearly applies to the January, 2003 test, which Peterson did not pass.

discrimination as to the January, 2003 test, which she failed, and that Brooks' use of the single norm Cooper Standard to score the 300 meter run was not a pretext for discrimination.[13] The referee found that the process of selecting canine handlers included a physical agility test conducted by the department, and that Peterson did not pass the department's physical agility test because she failed the 300 meter run under the single fitness norm. The referee rejected Peterson's argument that Brooks, motivated by discriminatory animus toward Peterson on the basis of her sex, scaled the 300 meter run using a single fitness norm to ensure that she failed. He also rejected Peterson's argument that there was no evidence to suggest that the academy required any particular score on the 300 meter run in order to submit candidates to its canine training program. The referee found that the most crucial qualification for selection to attend the academy was passing the department's physical agility test and that Peterson did not pass. The physical agility test conducted by the academy included a 300 meter run, which was scored using the Cooper Standards. In determining the passing score for each event in the January, 2003 physical agility test, which involved the 300 meter run, Brooks used the Cooper Standards that had been supplied to him by the academy. For the 300 meter run, the Cooper Standard used by Brooks did not differentiate between males and females or for the age of the candidate but, rather, provided a single set of scores. Following the January, 2003 physical agility test, Brooks contacted Sergeant Kevin Rodino, the commanding officer of the academy, and confirmed that a single norm standard was the proper standard utilized for the 300 meter run. Upon receiving confirmation from Rodino, Brooks determined that Peterson had failed the 300 meter run event.

---

[13] Brooks used this standard in the January, 2003 test, which Peterson did not pass, and the September, 2003 test, which Peterson passed.

Brooks first became aware of a Cooper Standard for the 300 meter run that was scored by age and gender at the hearing on Peterson's grievance, which, of course, occurred after the January-February, 2003 selection process. After having been made aware of this standard, Brooks did not reassess his use of a single norm standard in scoring the January 26, 2003 test. He had no preference as to what standard would be used, but wanted the department's test to employ the same standards as the academy. Because he believed that the academy used a single norm standard in January, 2003, Brooks used the same standard.

The referee's findings also support his conclusion that Peterson did not prove that the reasons provided for her not having been selected in September, 2003, were pretextual. As to Brooks' decision to assign the designated spot in the September, 2003 training class to Lawlor, despite his having ranked fourth, the referee determined that Brooks' decision in this regard was a result of a previous commitment to Lawlor. The referee stated that "[i]n addressing the issues raised by [Peterson] I could neither find justification, nor was any offered and substantiated, for concluding that using the results of the events to rank the candidates was improper." The referee determined that Brooks' ranking of the candidates to determine which candidate would be sent to canine training as Lawlor's alternate to be a "clear, understandable and objective standard." The referee found that the academy used the Cooper Standards scores as a "ranking tool." The referee did not credit Peterson's argument that the ranking system used by Brooks was a pretext for discrimination but found that argument to be "totally unsupported" by the evidence and "mere conjecture."

The referee's findings and conclusions indicate that, after considering Peterson's arguments, he rejected them and found that she had not met her burden of

proof. The referee found the following. In determining which candidates to send to the academy, Brooks ranked the candidates first through fifth place for each of the events and, after eliminating each candidate's lowest score, averaged the event scores. Peterson placed fifth and, accordingly, was not selected. Lawlor, the officer who placed fourth, was selected because he had to withdraw from an earlier canine training class. The officer who placed first was also selected.

The referee determined that the ranking of candidates was objective and not a pretext for discrimination. The referee found that Brooks began using the physical agility test as part of his selection process after he sent three officers to canine training and they failed the physical agility test administered by the academy. He wanted to avoid the embarrassment of officers' inability to pass the academy's physical agility test, and he wanted to avoid losing slots assigned to the department in the academy's sixteen week training class for canine handlers. On the record before us, we conclude that the referee's decision in this regard was based on substantial evidence.

### III

The defendant next claims that the court erred in reversing the decision of the referee and remanding the case to the referee for the purpose of reconsidering the issue of physical disability. We agree.

Peterson argued before the referee that she was discriminated against as a result of a physical disability (transsexual) and a mental disability (gender dysphoria).[14] The referee found that Peterson had been diagnosed with gender identity disorder, which is defined

---

[14] The referee construed Peterson's complaint as claiming both a mental disability and a physical disability.

in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (4th Ed. 1994) (DSM-IV). The referee concluded that Peterson was part of a protected class because of her mental disability.[15] With respect to Peterson's claim of physical disability, the referee found that Peterson had not produced sufficient evidence to satisfy the definition of "physical disability" in General Statutes § 46a-51 (15).[16]

The court determined that *Conway* v. *Hartford*, supra, 19 Conn. L. Rptr. 109, a case on which the referee had relied in the context of his discussion on physical disability, was not applicable and remanded the case for the referee to consider the issue of physical disability without the aid of *Conway*.

Peterson alleged discrimination under § 46a-60 (a) (1), which provides in relevant part: "It shall be a discriminatory practice in violation of this section . . . [f]or an employer, by the employer or the employer's agent . . . to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ."

---

[15] General Statutes § 46a-51 (20) provides: " 'Mental disability' refers to an individual who has a record of, or is regarded as having one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's 'Diagnostic and Statistical Manual of Mental Disorders.' "

[16] General Statues § 46a-51 (15) provides: " 'Physically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device . . . ."

The court improperly remanded the case to the referee regarding physical disability because such a finding was not necessary in the context of this case. Even if the referee were to have found that Peterson suffered from a physical disability neither the analysis nor the outcome of the case would change. When analyzing Peterson's claim of discrimination under the *McDonnell Douglas Corp.* test, the referee found that Peterson belonged to a protected class by virtue of a mental disability. A finding regarding physical disability would add nothing to the legal analysis and could not, in itself, change the result. No greater benefit would have arisen from being a member of a protected class for more than one reason. Accordingly, the court erred in reversing the referee's decision and remanding the case on this ground.

## IV

The defendant next claims that the court erred in reversing the decision of the referee and remanding the gender stereotyping claim to the referee. We agree.

"[I]n enacting Title VII [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII)], Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes. *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). . . . As a result, [s]ex stereotyping [by an employer] based on a person's gender non-conforming behavior is impermissible discrimination. . . . That is, individual employees who face adverse employment actions as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII." (Citation omitted; internal quotation marks omitted.) *Dawson* v. *Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005).

The referee determined that the *McDonnell Douglas Corp.* model was appropriate. The referee noted that, although gender stereotyping was a recognized claim, it was not clear exactly what Peterson was alleging with respect to her gender stereotyping claim. The referee did not find credible statements of Officer Darren Besse that, during the January, 2003 physical agility test, he had overheard Brooks refer to Peterson as a "he/she/it," say that he believed that Peterson should be graded as a male for the physical agility test or state that he would never send Peterson to the academy as she would be an embarrassment. The referee determined that once the "'Besse comments'" were rejected, the record contained no evidence to establish gender stereotyping by Brooks.

The court included a footnote in its discussion of the three issues that it remanded to the referee that "[t]he [commission] and [Peterson] may also seek clarification on remand on their gender stereotyping claim. . . . [T]he referee was unclear as to the nature of this claim. To the court, it appears that the [commission] and [Peterson] contend that [she] as a postoperative transsexual was entitled to be free from discrimination due to her past gender."

The defendant argues that, although the referee was somewhat puzzled as to what specifically Peterson was claiming in her gender stereotyping claim, he nevertheless considered the claim on the merits and found that there were no facts supporting the claim. Because the referee considered the claim and set forth his reasoning, the defendant argues that there was no need for the court to remand the claim of gender stereotyping to the referee.

The court addressed the issue of gender stereotyping in a brief footnote. The court did not explicitly reverse and remand on the issue of gender stereotyping, but

merely stated that the commission and Peterson *may* seek clarification on remand if they wanted to do so. The court's footnote regarding clarification of the gender stereotyping claim merely highlighted one aspect of the court's remand for further analysis regarding the discrimination claim. Because we have determined that the remand on the discrimination claim was improper, we have no further need to discuss the scope of the remand.[17]

## V

The defendant last claims that the court erred in reversing the decision of the referee and remanding the retaliation claim to the referee. We agree.

On August 6, 2003, Peterson filed her initial complaint with the commission alleging that on or about February 11, 2003, she was denied the opportunity to be trained as a patrol canine handler because of her sex and physical disability in violation of §§ 46a-58 (a) and 46a-60 (a) (1). On October 15, 2003, Peterson amended her complaint to add a claim of retaliation in violation of § 46a-60 (a) (4). In her affidavit in support of her amended complaint, Peterson stated: "I believe I was denied training opportunities and the position of patrol K-9 handler because I have opposed discriminatory employment practices and because I filed a complaint with the [commission]."

In his November 4, 2008 decision, the referee dismissed Peterson's claim of retaliation. The referee analyzed Peterson's retaliation claim as it pertained to the

[17] The United States Supreme Court embraced a gender stereotyping theory of Title VII liability in *Price Waterhouse* v. *Hopkins*, supra, 490 U.S. 228. In that case, the court determined that "[i]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course at charm school.' " Id., 256. Nonetheless, we conclude that the referee's credibility determination is dispositive of this claim. If the referee did not find Besse's statements credible, then there was no viable claim.

selection process including the September, 2003 physical agility test and determined that, assuming arguendo that Peterson had established a prima facie case, Peterson had not sustained her burden to prove that the legitimate business reasons advanced by the defendant were merely a pretext for retaliation.

On May 4, 2010, the court remanded the matter to the referee to clarify, inter alia, whether his decision addressed the retaliation claim as it might relate to the January-February, 2003 selection process. The referee clarified that he did not address the retaliation claim as to the January-February, 2003 selection process because neither the initial complaint nor the amended complaint alleged that Brook's determination that Peterson had failed the January 26, 2003 agility test was motivated by retaliation. The referee further stated that the only protected activity alleged in the amended complaint was Peterson's filing of the initial complaint. Accordingly, the referee's decision addressed only that protected activity. Because the filing of the complaint followed the announcement of the results of the January-February 2003 selection process, the department's failure to select her in February could not logically have been motivated by the filing of that complaint.

In its memorandum of decision, the court concluded that the referee erred in determining that the only protected activity Peterson alleged in the retaliation claim of the amended complaint was the filing of the August, 2003 commission complaint. The court determined that the amended complaint, when read liberally, included claims that a retaliatory motive underlay her failure to be chosen in both the January-February, 2003 and the September, 2003 selection processes.[18] The court concluded that Peterson's claims of retaliation in the January-February, 2003 selection process, which claims

[18] Peterson's posthearing brief reveals the following as a claimed basis for her retaliation claim regarding the February, 2003 selection process, which she alleged she made in her amended complaint. Peterson responded

were raised in October, 2003, relate back to the August, 2003 complaint and, thus, were not time barred by the 180 day limitation period of General Statutes § 46a-82 (f).

The defendant claims that the court erred in reversing the decision of the referee and remanding the retaliation claim because the October 15, 2003 amended complaint did not relate back to the August 6, 2003 complaint. Accordingly, the defendant contends that, under the applicable 180 day statute of limitations, allegations of retaliatory acts that occurred before April 18, 2003, are time barred and, therefore, any act of retaliation occurring during the January-February, 2003 selection process may not provide the basis for a viable cause of action under this analysis.

According to § 46a-82 (f), a complaint to the commission alleging employment discrimination "must be filed within one hundred and eighty days after the alleged act of discrimination . . . ." General Statutes § 46a-82 (f). The 180 day time requirement is not jurisdictional but rather is subject to waiver and equitable tolling. *Williams* v. *Commission on Human Rights & Opportunities,* 257 Conn. 258, 266–70, 777 A.2d 645 (2001).

Section 46a-54-38a (b) of the Regulations of Connecticut State Agencies is similar to our common law and provides: "A complaint may be amended to restate its contents on a commission complaint form, to cure technical defects and omissions or to clarify and amplify

to the May, 2002 announcement for patrol canine handlers but was not among those selected by Brooks to take the December, 2002 academy physical agility test. Peterson complained to her union president that she had been discriminated against in the December, 2002 selection process. Wood spoke with Brooks and the chief of police. During the January, 2003 department physical agility test, Brooks exhibited hostility and anger toward Peterson. Under this reasoning, the decision not to select her in February, 2003, was motivated by Brooks' desire to retaliate for her complaint to the union.

allegations made therein. Such amendments and amendments alleging additional acts that constitute discriminatory practices which are reasonably like or related to or growing out of the allegations of the original complaint, including those facts discovered during the investigation of the original complaint, and including additional protected class status or naming additional respondents who have had notice of the complaint, relate back to the date the complaint was first received."

"In reviewing whether the court properly concluded that the relation back doctrine applied to the amended commission complaint, we look to our well established common-law rules governing that doctrine established by our courts." *Wright* v. *Teamsters Local 559*, 123 Conn. App. 1, 6, 1 A.3d 207 (2010). "[A] party properly may amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same. . . . If a new cause of action is alleged in an amended complaint, however, it will [speak] as of the date when it was filed. . . . A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief. . . . A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action. . . . It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but whe[n] an entirely new and different factual situation is presented, a new and different cause of action is stated." (Citations omitted; internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 129–30, 788 A.2d 83

(2002). "If the alternate theory of liability may be supported by the original factual allegations, then the mere fact that the amendment adds a new theory of liability is not a bar to the application of the relation back doctrine. . . . If, however, the new theory of liability is not supported by the original factual allegations of the earlier, timely complaint, and would require the presentation of new and different evidence, the amendment does not relate back." (Citation omitted.) *Sherman* v. *Ronco*, 294 Conn. 548, 563, 985 A.2d 1042 (2010).

Our review of the applicability of the relation back doctrine is plenary. See id., 554 n.10. The interpretation of pleadings also presents a question of law over which our review is plenary. *Landry* v. *Spitz*, 102 Conn. App. 34, 41, 925 A.2d 334 (2007).

In determining whether the relation back doctrine applies, we begin with a closer look at Peterson's initial and amended complaints. Peterson's initial complaint, in August, 2003, concerned the January-February, 2003 selection process and included allegations of events occurring prior to that process that show a possibility of discrimination in that process. In her affidavit in support of her initial complaint, Peterson stated that she repeatedly had applied for and repeatedly been denied the position of patrol canine handler, most recently on February 11, 2003.[19] Peterson's amended complaint filed in October, 2003, in contrast, alleged facts occurring after the filing of her initial complaint. In her affidavit in support of her amended complaint, she stated that after she had filed the complaint with the commission in August, 2003, she passed the physical agility test administered by the defendant but was nonetheless denied the opportunity to go to the requisite training to become a patrol canine handler.

---

[19] The initial complaint included a form, where Peterson checked off the applicable statutes and forms of discrimination, and an affidavit. The amended complaint consisted of an affidavit.

The language in her amended complaint specifically at issue before the referee and the trial court is as follows. "After filing the complaint of discrimination, I applied for a position of patrol K-9 handler. In August, 2003, I passed the physical agility test administered by the [department]. I was denied the opportunity to go to the requisite training to become a patrol K-9 handler. I believe I was denied training opportunities and the position of patrol K-9 handler because I have opposed discriminatory employment practices and because I filed a complaint with the [commission]." She clearly stated two bases for her claim of retaliation: her opposition to discriminatory employment practices *and* the filing of her August, 2003 complaint with the commission. The only act of retaliation alleged was the failure to select her in the September, 2003 selection process.[20] The phrase "because I have opposed discriminatory employment practices" stated another possibly protected activity, in addition to the filing of the August, 2003 complaint, on which she based her claim that her rejection in the September, 2003 selection process was the result of a retaliatory motive.

The alleged act of retaliation in the amended complaint is, however, her failure to be selected in the September, 2003 selection process, and, therefore, the operative facts ought not be deemed to arise from or to amplify the allegations in the initial complaint, which concerned, as an act of retaliation, the January-February, 2003 selection process. Because the allegations in the amended complaint present a different set of operative facts from those presented in the initial complaint, the relation back doctrine is inapplicable.[21] The referee

[20] Her affidavit refers to an "August 2003" physical agility test. Both parties, the referee and the court apparently understood this to refer to the September 7, 2003 physical agility test.

[21] The facts of *Wright* v. *Teamsters Local 559*, supra, 123 Conn. App. 1, provide a useful foil. There, a union member claimed that he lost his position as a union steward because of racial discrimination. Id., 3. He subsequently amended his complaint to include age discrimination as another reason he

properly declined, therefore, to address the issue of retaliation in the January-February, 2003 selection process because the initial complaint did not raise it, and the amended complaint was filed too late to raise it in a timely manner. Accordingly, the court erred in reversing the decision of the referee and remanding the issue of retaliation as to the January-February, 2003 selection process to the referee.[22]

The judgment is reversed and the case is remanded to the trial court with direction to dismiss the plaintiffs' appeal and to render judgment enforcing the decision of the referee.

In this opinion the other judges concurred.

lost his position. Id. Because the same set of facts underlay each complaint in that case, but the second complaint alleged discrimination that arose from an additional alleged animus, the second complaint related back to the first. Id., 6–7. In the present case, an entirely different act of retaliation is alleged in the second complaint, and, therefore, a different set of operative facts exists.

[22] We note that the referee found, in any event, that the results of both selection processes were motivated only by legitimate considerations.