******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ROBERT MEYERS *v.* TOWN OF MIDDLEFIELD
## (AC 42555)

Lavine, Prescott and Elgo, Js.*

*Syllabus*

The plaintiff, a building official for the defendant town of Middlefield, appealed from the judgment of the trial court dismissing his administrative appeal from the decision of the defendant's Board of Selectmen to terminate his employment. The plaintiff was responsible for processing applications for certificates of occupancy and administering and enforcing the state building code. The board alleged, inter alia, that during the plaintiff's employment as the town building official, his performance and conduct regarding several long-standing projects was unreasonable and that he failed to follow instructions and directives. The board alleged that the plaintiff obstructed the issuance of a certificate of occupancy to P Co., a company that owned a commercial ski property. Thereafter, the board unanimously voted to terminate the plaintiff's employment and the plaintiff filed a complaint in the Superior Court, pursuant to statute (§ 29-260 (c)), appealing his discharge, which the court dismissed. *Held*:

1. The trial court did not err in determining that there was substantial evidence in the record to support the board's decision to terminate the plaintiff's employment as the town's building official: the evidence demonstrated that the plaintiff sought to carry out his vow of never granting P Co. a certificate of occupancy by constantly interjecting new or resolved compliance issues whenever P. Co. was on the verge of being issued a certificate of occupancy; moreover, there was substantial evidence of the plaintiff's insubordination when he abandoned his duties by leaving an inspection against instruction, repeatedly acted outside the scope of his role by raising matters outside his jurisdiction to obstruct the issuance of the certificate of occupancy to P Co., and misplaced paperwork submitted to him by P Co. on more than one occasion.

2. The plaintiff could not prevail on his claim that the trial court improperly upheld the board's decision to terminate his employment because the decision violated public policy, constituting a wrongful discharge, this claim having failed for the lack of a factual finding by the board or the trial court that the termination of his employment was pretextual and/or retaliatory; there was substantial evidence before the board to support the plaintiff's discharge on one or more of the grounds set forth in its notice of charges, as the facts presented to the board supported a conclusion that his dismissal was warranted for failing to perform the duties of his office, conduct which fell within the statutorily authorized basis in § 29-260 (b) to terminate his employment, as the record demonstrated that the plaintiff vowed that he would never issue a certificate of occupancy to P Co. regardless of P Co.'s compliance with the building code.

Argued September 15, 2020—officially released January 19, 2021

*Procedural History*

Administrative appeal from the decision of the defendant's board of selectmen terminating the plaintiff's employment as a building official, brought to the Superior Court in the judicial district of Middlesex and tried to the court, *Frechette, J.*; judgment dismissing the appeal, from which the plaintiff appealed to this court. *Affirmed*.

*Eric R. Brown*, for the appellant (plaintiff).

*John A. Blazi*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. The plaintiff, Robert Meyers, appeals from the judgment of the Superior Court dismissing his administrative appeal from the unanimous decision of the Board of Selectmen of the Town of Middlefield (board) to terminate his employment as the statutory building official for the defendant, the town of Middlefield (town). On appeal, the plaintiff claims that the court improperly (1) concluded that the decision to terminate his employment was supported by substantial evidence in the record and (2) upheld the decision of the board to terminate the plaintiff's employment because the decision violated public policy. We disagree and, accordingly, affirm the judgment of the court.

The record reveals the following relevant facts and procedural history. The plaintiff was employed as a building official[1] for the town pursuant to General Statutes § 29-260 (a) since April, 2011.[2] As delineated in § 29-260 (a), the plaintiff was required to administer and to enforce the State Building Code (building code) in the town. The plaintiff also was responsible for processing applications for certificates of occupancy. Jon Brayshaw was the elected first selectman of the town when the plaintiff commenced his employment with the town.

In 2008, the town purchased property known as Powder Ridge Mountain Park, located at 99 Powder Hill Road in Middlefield (property). At some point during the property's vacancy between 2008 and 2012, the plaintiff sent a "Notice of Unsafe Structure" to the town regarding the property in which the plaintiff cited various violations of the building code. In September, 2012, the town sold the property to Powder Ridge Mountain Park and Resort, LLC (company). The plaintiff thereafter rescinded the "Notice of Unsafe Structure" in December, 2012.

After the purchase of the property by the company, the plaintiff requested additional work hours and support from the town in order for him to perform his duties with respect to other large scale construction projects underway in the town and to assist with oversight of the proposed renovations to the property. In response, the town hired another building official, Harwood Loomis, as a consultant, and also hired an assistant building official, Vincent Garofalo, to assist the plaintiff with the inspections of the property. The town also later enlisted the help of other state and local officials, including Deputy State Building Inspector Daniel Tierney, to assist the plaintiff with processing the application for a certificate of occupancy with respect to the property.

In November, 2015, Edward Bailey replaced Jon Brayshaw as the town's first selectman. Upon assuming his new role, Bailey became aware of ongoing conflict

between Sean Hayes, the owner of the company, and the plaintiff. Specifically, one source of major conflict stemmed from the plaintiff's repeated denials of the company's applications for a certificate of occupancy for a second floor restaurant, bar, and kitchen that were located in the ski lodge on the property.

The company had begun renovating the second floor restaurant in December, 2015. Garofalo conducted an inspection of the second floor in December, 2015, and concluded that a temporary certificate of occupancy could be issued so long as a fire watch was on duty because the sprinkler system was not yet operational. The Middlefield Fire Department agreed to provide the fire watch service. The plaintiff, however, denied the company's request for a temporary certificate of occupancy, attributing the denial to the lack of an operational sprinkler system.

The plaintiff also issued an abatement order that led to the business closing temporarily. Tierney eventually waived the fire sprinkler requirement so that the company could receive a temporary certificate of occupancy and reopen for business. Despite Tierney's waiver, the plaintiff proceeded again to deny the temporary certificate of occupancy due to the absence of the sprinkler system. The town's fire marshal informed the company that the fire department no longer could provide its fire watch services because the company did not have a temporary certificate of occupancy.

One month later, a construction services building official completed an inspection of the property for an electrical permit for fire pump wiring and determined that the building code requirements had been met. When Garofalo advised the plaintiff that the company's electrical permit was ready for approval, the plaintiff indicated to Garofalo that he would issue it. Despite the plaintiff's representation to Garofalo, the plaintiff five days later raised an issue with the electrical permit application. The plaintiff claimed that the company was in violation of the building code because the fire pump lacked a reliable source of power and needed an additional source of power or backup power. The plaintiff further claimed that he could not issue an electrical permit with the ongoing fire pump violations unless the company submitted a modification request and received approval from the state waiving the company's need to satisfy the applicable building code provision. Tierney and other officials had informed the plaintiff that no such modification request was required because the company was not in violation of the building code as it pertained to the wiring for the fire pump. After meeting resistance from the plaintiff, Tierney suggested to the company that it should submit a modification request, despite not needing one, in order to avoid any further impediments to the renovation project. The company then submitted a modification request in February,

2016, that was subsequently approved by Tierney. After receiving the approval, the company sought another temporary certificate of occupancy from the plaintiff, but, rather than issuing the temporary certificate, the plaintiff raised another issue with the company's property as grounds for denying the company a temporary certificate of occupancy.

On March 4, 2016, the plaintiff requested information from Garofalo about an inspection of the septic pump wiring. Garofalo informed the plaintiff that the pump had no bearing on whether to grant a temporary certificate of occupancy because the pump was not a part of the structure and, thus, it did not require any approval by the building official. Nevertheless, an inspection was completed at the plaintiff's insistence, and the pump passed inspection on March 7, 2016. The plaintiff received notice of the pump inspection results, and the company immediately requested that he issue a certificate of occupancy. The plaintiff informed the company that he would conduct a final walk-through of the property the following week before issuing a certificate of occupancy.

Before the walk-through took place, Garofalo raised his concerns to Bailey in an e-mail about the plaintiff's conduct throughout the Powder Ridge renovation project. Garofalo believed, on the basis of his observations, that the plaintiff was using insignificant compliance issues as a pretext for denying the company's temporary certificate of occupancy, that the plaintiff was not interested in compliance or assisting the company to become compliant, and that the plaintiff was ignoring his official duties.

The final walk-through did not take place until April 11, 2016, after which the town's fire chief indicated that a certificate of occupancy could be issued. In response to an advisement by both Garofalo and the fire chief that the certificate of occupancy should be issued, the plaintiff stated that he could not approve the request for a certificate of occupancy because he was not permitted to attend the final walk-through and did not have paperwork for propane tanks that were located outside the company's ski lodge. Tierney informed the plaintiff that the propane tanks had no bearing on the certificate of occupancy approval and that, even if they did, as noted by Hayes on numerous occasions, the company had submitted the propane tank applications in 2012 and 2013,[3] and the plaintiff had failed to take any action on those applications. On May 19, 2016, the plaintiff referred Hayes to the Office of the State's Attorney for criminal prosecution for alleged building code violations at the property, citing an earlier sprinkler code violation as the basis for the referral, despite the fact that the sprinkler system was now compliant with the building code. No action was taken by the Office of the State's Attorney.

On June 1, 2016, the company submitted another request for a certificate of occupancy. On June 15, 2016, the plaintiff conducted an inspection of the property. After the inspection, in a memorandum prepared by Bailey,[4] Bailey indicated that he asked the plaintiff to submit a report to him on the inspection by June 16, 2016, to which the plaintiff responded he could not do so because it was an "unreasonable request." Bailey agreed to extend the deadline to June 17, 2016. In a June 16, 2016 e-mail, the plaintiff responded to the company's June 1, 2016 request by informing the company that he would not issue the certificate of occupancy because the company had not addressed the propane tank violation that the plaintiff had pointed out earlier. The plaintiff then submitted the inspection report to Bailey on June 21, 2016, four days later than the June 17, 2016 deadline Bailey had set. The inspection report included a denial of the company's request for a certificate of occupancy and cited, inter alia, parking lot violations and the absence of a permit for one of the propane tanks.

After the plaintiff's denial of the company's application for a certificate of occupancy because the company's propane tank outside the building purportedly required a permit under the building code, Tierney sought to clarify for the plaintiff that the propane tanks were not within the jurisdiction of the building official. Hayes then appealed the plaintiff's decision by way of an e-mail to the State Building Inspector, Joseph Cassidy, seeking clarification regarding the provisions in the building code relied on by the plaintiff in his denial of the company's application. In response to Hayes' appeal, Cassidy sent a letter dated June 28, 2016, to Hayes and to the plaintiff informing them that the local fire marshal had primary jurisdiction over the propane tanks, not the local building official, and that the installation of the tanks did not fall within the building code. Despite Cassidy's clarification regarding the governing authority over propane tanks, the plaintiff continued to disagree with Cassidy's interpretation of the building code.

On July 5, 2016, Tierney provided the plaintiff with an e-mail from William Abbott, the State Fire Marshal, to inform the plaintiff that the provisions on which he had relied in construing the building code regarding the propane tanks had been repealed on January 1, 2015. The plaintiff had been relying incorrectly on a 2009 revision of the building code. Nevertheless, the plaintiff claimed that Tierney, Cassidy, and Abbott were wrong in their construction of the building code, which prompted Bailey to insist that the plaintiff personally reach out to Abbott to discuss the issue regarding the propane tanks. The plaintiff, however, explicitly refused to do so.

Hayes submitted another formal request to the plain-

tiff for the property's certificate of occupancy on July 5, 2016, and also requested an inspection of the second floor restaurant. The plaintiff told the company that he had left a letter that was ready to be sent out by Nancy Davidson, the land use office assistant, but Davidson did not see such letter upon her return to the office on July 6, 2016.[5] In a memorandum written by Bailey, Bailey indicated that the plaintiff refused to conduct the inspection as requested by the company, stating that he was "too busy" to inspect the company's property and "had other things to do." On July 8, 2016, Hayes reached out to state and local officials in an e-mail to express his frustration with the issues he had faced in the past two years in attempting to obtain a certificate of occupancy from the plaintiff. Hayes also disclosed in the e-mail that the plaintiff publicly had stated that he never would sign the certificate of occupancy for the property.

In Bailey's final memorandum regarding his interactions with the plaintiff, Bailey detailed the final incident that led to the institution of termination proceedings against the plaintiff. Bailey wrote that while he and the plaintiff were at the company's property for an inspection on July 8, 2016, the plaintiff raised new issues that he had never raised before. Bailey also wrote that, during the inspection, Hayes informed the plaintiff again that he already had submitted applications for the propane tanks in 2012 and 2013, which were awaiting the plaintiff's approval. The plaintiff responded to Hayes by stating that he did not want to hear what Hayes had to say regarding the applications. The plaintiff then left, indicating that he did not want to be involved in a "hostile situation." Despite Bailey's order that the plaintiff stay and complete the inspection, the plaintiff left without completing the inspection. Bailey placed the plaintiff on paid administrative leave on July 12, 2016, following the incomplete inspection at the property.

An investigation by the board into the plaintiff's performance and conduct ensued. The board consisted of Bailey, Taryn Ruffino, and Brayshaw. Predisciplinary hearings were held by the board thereafter, during which the plaintiff and his union representatives[6] were allowed to respond to the concerns raised about the plaintiff's performance and conduct as a building official. The predisciplinary hearings took place on August 2, October 13, November 9, and December 13, 2016.

On January 18, 2017, Bailey sent the plaintiff a written notice stating that the board would conduct a public hearing on January 24, 2017, to consider terminating the plaintiff from his position. The notice also specifically outlined the reasons why the board was considering such action: "[1] Your failure and/or refusal to promptly [and] reasonably perform your duties, including but not limited to long-standing projects such as Powder Ridge.

Indeed, you allowed months to pass with little if any follow-up to resolve such long-term projects. Your failure and/or refusal in this regard is supported by the complaints that the [t]own has received that you have intentionally and unjustifiably obstructed and prevented Powder Ridge from obtaining a certificate of occupancy for an extended period of time and your own statements made on several occasions that you will never issue such a certificate of occupancy with respect to that project. It is further supported by your failure to accept guidance and/or directives of state and local officials who were assisting with resolving this project. [2] Your failure to maintain and retain proper documentation submitted by applicants and records of your own actions with respect to such long-term projects such as Powder Ridge. Such documentation issues include errors and inaccuracies and failure to provide relevant and required backup for legal documents. [3] Your failure to follow reasonable instructions and/or abide by your assigned work hours including but not necessarily limited on the following dates: January 20, 2016, April 11, 2016, May 12, 2016, May 13, 2016, May 18, 2016, and July 8, 2016. [4] Your display of inappropriate conduct and/or insubordination on May 12, 2016, May 13, 2016, May 19, 2016 and July 8, 2016.''

A public hearing moderated by Bruno Morasutti, the town attorney, was conducted on January 24, 2017. The evidence presented to the board during the public hearing included testimony, e-mails, memoranda written by Bailey detailing his observations, and other documents. After considering the evidence before it, in a special meeting held on February 16, 2017, the board unanimously voted to terminate the plaintiff from his position as the building official with an effective termination date of February 21, 2017. The board did not issue written findings regarding the factual basis for its decision to terminate the plaintiff or state explicitly which of the grounds for termination listed in the notice of charges it deemed established.

After the termination of his employment, the plaintiff filed a complaint with the Superior Court pursuant to § 29-260 (c), appealing the board's decision to terminate his employment. After the parties' submitted briefs in support of their respective positions, the court conducted a hearing limited to oral argument. The court subsequently issued a memorandum of decision in which it concluded that the plaintiff had failed to demonstrate that the board had acted improperly. In doing so, the court first discussed the appropriate standard of review of the board's decision. The court noted that there is a dearth of authority on the standard of review for administrative appeals brought pursuant to § 29-260. The court then determined that it should use the standard of review applicable in appeals from decisions of municipal zoning boards. In most circumstances, that standard requires a reviewing court to uphold the

decision of the zoning board provided that the board did not unreasonably, arbitrarily or otherwise abuse its discretion, and the decision is supported by substantial evidence. See, e.g., *Rapoport* v. *Zoning Board of Appeals*, 301 Conn. 22, 32–34, 19 A.3d 622 (2011).

Applying that standard, the court determined that the board did not abuse its discretion or act illegally in deciding to terminate the plaintiff's employment because there was substantial evidence in the record to support the board's decision to terminate the plaintiff from his position. Specifically, the court concluded that there was substantial evidence before the board that the plaintiff failed to perform his duties when he intentionally obstructed, without justification, the issuance of a certificate of occupancy for the property. Moreover, the court concluded that the substantial evidence before the board showed that the plaintiff neglected to "pass on items that fell under the building code, walked off of an inspection of Powder Ridge," and repeatedly raised additional issues that were not under the building code and therefore his jurisdiction, thereby leading to an inference that the plaintiff did so in an improper attempt to prevent the company from obtaining a certificate of occupancy. The court dismissed the plaintiff's appeal on January 17, 2019.

This appeal followed. Additional facts will be set forth as necessary.

I

We first address the plaintiff's factual challenge to the propriety of the board's decision to terminate his employment pursuant to § 29-260. Specifically, the plaintiff asserts that the court improperly determined that there was substantial evidence in the record to support the board's decision to terminate his employment as the town's building official.[7] We are not persuaded.

At the outset, as a matter of first impression, we first must establish the proper standard of appellate review of the propriety of a board's decision to terminate a building official's employment pursuant to § 29-260. Section 29-260 (c) itself contains some language bearing on the standard of review: "The court may affirm the action of [the board] or may set [the board's decision] aside if it finds that [the board] acted illegally or abused its discretion. . . ." General Statutes § 29-260 (c). The statute, however, does not address the manner in which this determination should be made.

The town asserts that this court, consistent with the trial court's approach, should adopt the substantial evidence test typically applied in zoning appeals to review the plaintiff's claims on appeal. The plaintiff asserts that, with respect to his claim that the board's decision to terminate his employment violates public policy, this court should apply a de novo standard of review

because it is fundamentally a legal determination. With respect to his factual challenge to the propriety of the board's decision, the plaintiff concedes that the substantial evidence standard of review should be applied, but relies on cases applying that standard when reviewing decisions from municipal personnel and pension appeals boards.

We conclude that we should adhere to the standard of review set forth in administrative appeals from municipal boards and agencies[8] outside of the zoning context. See, e.g., *O'Connor* v. *Waterbury*, 286 Conn. 732, 740–41, 945 A.2d 936 (2008) (administrative appeal from decision of Waterbury's retirement board). The present appeal raises legal and factual claims that are akin to the types of claims raised in administrative appeals from the decisions of boards of selectmen or similar types of administrative agencies in the employment context. See *Rodgers* v. *Board of Education*, 252 Conn. 753, 760–61, 749 A.2d 1173 (2000) (appeal from board of education's decision to terminate tenured teacher's employment); *Fagan* v. *Stamford*, 179 Conn. App. 440, 453–55, 180 A.3d 1 (2018) (appeal from pension trust fund board's decision to award former police officer disability pension that was one half his annual compensation); see also *Greene* v. *Waterbury*, 126 Conn. App. 746, 749–50, 12 A.3d 623 (2011) (appeal from retirement board's denial of former firefighter's request to resubmit disability pension application).[9]

Accordingly, to the extent that the plaintiff challenges the factual conclusions of the board, we review his claims pursuant to the substantial evidence standard set forth in *O'Connor*: "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . .

"The substantial evidence rule governs judicial review of administrative fact-finding . . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . . It is fundamental that a plaintiff has the burden of proving that the [municipal board], on the facts before [it], acted contrary to law and in abuse of [its] discretion . . . . The law is

also well established that if the decision of the [municipal board] is reasonably supported by the evidence it must be sustained. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Citations omitted; internal quotation marks omitted.) *O'Connor* v. *Waterbury*, supra, 286 Conn. 741–42

Before discussing the evidence in the record, it is important to emphasize that the board gave notice of several bases on which it was considering termination. As we previously discussed, on January 18, 2017, the town sent the plaintiff a notice that listed the reasons why the board was considering his dismissal. Specifically, the notice indicated that the plaintiff had (1) failed and/or refused to promptly and reasonably perform his duties, including but not limited to long-standing projects such as Powder Ridge, where the plaintiff allowed months to pass with little if any follow-up to resolve such long-term projects, (2) failed to maintain and to retain proper documentation submitted by applicants and records of his own actions with respect to such long-term projects as Powder Ridge, including documentation of errors and inaccuracies and a failure to provide relevant and required backup for legal documents, (3) failed to follow reasonable instructions and/or to abide by his assigned work hours including but not limited to January 20, April 11, May 12, May 13, May 18 and July 8, 2016, and (4) displayed inappropriate conduct and/or insubordination on May 12, May 13, May 19, and July 8, 2016.

Moreover, it is important to emphasize that the board did not issue written findings regarding the factual basis for its decision to terminate the plaintiff's employment or state explicitly which of the grounds for termination listed in the notice of charges it deemed established. With respect to the lack of written findings of fact by the board, the plaintiff failed to pursue a number of potential avenues to remedy this problem. First, the plaintiff failed to request, as permitted by § 29-260 (c), that the court take additional evidence or testimony. The plaintiff also failed to request that the court "appoint a referee or a committee to take such evidence as the court may direct and report the same to the court with his or its findings of fact, which report shall constitute a part of the proceedings upon which the determination of the court shall be made." General Statutes § 29-260 (c). Finally, the plaintiff could have requested that the court, while maintaining its jurisdiction over the appeal, remand the case to the board so that the board could issue written factual findings. See, e.g., *Hartford* v. *Hartford Electric Light Co.*, 172 Conn. 71, 73, 372 A.2d 131 (1976) (reviewing court authorized to remand matter to administrative agency for additional findings); *Commission on Human Rights & Opportunities* v. *Hartford*, 138 Conn. App. 141, 154

n.9, 50 A.3d 917 (reviewing court authorized to remand matter to agency for articulation of factual findings), cert. denied, 307 Conn. 929, 55 A.3d 570 (2012). The plaintiff, however, failed to pursue any of the described avenues, thereby limiting the scope of our review of the board's decision. Thus, if we find substantial evidence to support any of the alleged grounds for dismissal, then we must affirm the board's decision to terminate the plaintiff's employment. See, e.g., *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 587–88, 628 A.2d 1286 (1993) ("[a] reviewing court must sustain the agency's determination if an examination of the record discloses [substantial] evidence that support any one of the reasons given" (internal quotation marks omitted)); *Keiser* v. *Conservation Commission*, 41 Conn. App. 39, 42, 674 A.2d 439 (1996) ("[I]t is improper for the reviewing court to reverse an agency decision simply because [the] agency failed to state its reasons for its decision on the record. The reviewing court instead must search the record of the hearings before the commission to determine if there is an adequate basis for its decision." (Internal quotation marks omitted.)). Because the board made no explicit findings as to which of these grounds had been proven, and the plaintiff has failed to take steps to remedy the lack of specific findings, we review the evidence that was before the board to determine whether there was substantial evidence to support the board's decision to dismiss the plaintiff on the basis of *any* of the grounds set forth in the notice.

On appeal, the plaintiff seeks to reduce the reason for his dismissal by the board as a termination rooted in a mere disagreement about the interpretation of the building code provisions and political corruption. A review of the evidence that was before the board, and which we must assume the board credited, tells a different story.

The record contains evidence that the plaintiff stated on more than one occasion that he would *never* grant the company a certificate of occupancy. The board was free to infer from this evidence that the plaintiff would continue to refuse to issue a certificate of occupancy for the property even if the company was in full compliance with the exact letter of the building code. Such conduct, of course would constitute an abject failure of the building official "to perform the duties of his office" within the meaning of § 29-260 (b).

The board's conclusion that the plaintiff would never issue a certificate of occupancy to the company even if the property was in full compliance with the building code is buttressed by not just the plaintiff's words but also his conduct. For example, Garofalo had found it appropriate for the restaurant to be granted a temporary certificate of occupancy after his and Tierney's inspection in January, 2016. Garofalo had approved the grant

of the temporary certificate of occupancy after the local fire department offered to provide fire watch services because the sprinkler system was not operational. Nevertheless, the plaintiff decided to ignore Garofalo's findings and issued a notice of violation to the company and ordered closure of the restaurant on January 15, 2016. Moreover, even though Tierney granted the company a waiver of the sprinkler system requirement on January 19, 2016, the plaintiff issued a *second* notice of violation to the company on January 21, 2016, on the basis of the very sprinkler system for which Tierney had issued a waiver. Accordingly, there was no valid basis for the second notice of violation, and the board reasonably could have concluded that the plaintiff's conduct is a clear reflection of his desire to impede the company from ever receiving a certificate of occupancy.

In an even more telling act of interference with the company's legitimate efforts to obtain a certificate of occupancy, the plaintiff referred the company's owner for criminal prosecution months later on May 19, 2016, based on the very sprinkler system issue that the company already had resolved and for which it previously had received a waiver.

In furtherance of his stated goal, the plaintiff raised other issues outside the purview of the building code as a pretext for repeated denials. For instance, the plaintiff frustrated the issuance of a temporary certificate of occupancy by requiring an inspection of the septic pump wiring, even after Garofalo informed the plaintiff that the pump was not a part of the structure and thus did not need to be inspected in order for the plaintiff to issue a temporary certificate of occupancy. In response, the company had the pump wiring inspected even though it was not necessary to do so. Nonetheless, although the pump wiring underwent and passed inspection, the plaintiff still refused to grant the company's renewed request for a certificate of occupancy even after the plaintiff received notice of the favorable septic pump inspection results.

Additionally, on April 6, 2016, the Middlefield fire chief recommended that a certificate of occupancy should be issued for the second floor restaurant and bar at the property after finding that the company had met the necessary requirements. After a final walk-through on April 11, 2016, with Garofalo and other officials, Garofalo sent an e-mail the next day to the plaintiff and the other parties involved that all outstanding issues with the restaurant had been resolved and a certificate of occupancy should be issued for the restaurant and bar. The plaintiff again denied the company's request for the certificate of occupancy in a letter sent to the company on April 20, 2016, citing as grounds for the denial that he was not allowed to attend the inspection and noting the propane tank permit issue, even though

the propane tanks had no bearing on issuing the certificate of occupancy.

On June 1, 2016, the company again requested a certificate of occupancy in an e-mail to the plaintiff. The plaintiff completed another inspection of the property on June 15, 2016, and sent a certificate of occupancy report to Hayes on June 17, 2016, refusing to grant a certificate of occupancy. The plaintiff cited purported violations that were outside the second floor restaurant and bar such as parking lot violations and a purported propane tank violation. The plaintiff also insisted that the propane tanks were within the purview of the building code despite being told otherwise by Cassidy, Abbott, and Tierney. Even though the plaintiff dwelled on the purported lack of propane tank permits, the company actually had submitted permit applications on two separate occasions in 2013 and 2014, on which the plaintiff had failed to act and also apparently had misplaced. The evidence of the plaintiff's unwillingness or inability to account for the applications previously submitted to the plaintiff by the company supports the board's decision to terminate the plaintiff's employment for failing to maintain and to retain proper documentation submitted by applicants, as alleged in the notice of charges. This evidence is also consistent with the plaintiff's statements that he would never issue a certificate of occupancy to the company.

Finally, on July 8, 2016, during the last inspection that was requested by the company, the plaintiff chose to leave mid-inspection and failed to complete the inspection because he did not want to answer the owner's questions regarding the propane permit applications that had been submitted to the plaintiff but on which the plaintiff had yet to act. The plaintiff chose to abandon his duties by leaving the site of the inspection despite being instructed by Bailey to complete the inspection. The plaintiff's decision to ignore Bailey's directive is evidence that supports the board's decision to terminate the plaintiff's employment for insubordination and for failure to abide by his assigned work hours.

In sum, there is substantial evidence in the record that tends to demonstrate that the plaintiff sought to carry out his stated vow of never granting the company a certificate of occupancy by constantly interjecting new or resolved compliance issues whenever the company was on the verge of being issued a certificate of occupancy. The plaintiff also frustrated the application process with collateral matters and misplaced paperwork submitted to him by the company on more than one occasion. Furthermore, the record contains substantial evidence of the plaintiff's insubordination when he abandoned his duties by leaving the inspection against Bailey's instruction and also repeatedly acted outside the scope of his role by raising matters outside his jurisdiction to obstruct the issuance of the certifi-

cate of occupancy.

Consequently, because one of the main functions of the plaintiff's role was to issue a certificate of occupancy for those buildings that complied with the building code, there was substantial evidence presented to the board to support a conclusion that the plaintiff failed to perform his duties when he stated he would never issue the company a certificate of occupancy and repeatedly denied the company's application for a temporary certificate of occupancy and a certificate of occupancy despite the company's compliance with the building code. Because there was substantial evidence adduced at the hearing to support the board's decision to terminate the plaintiff's employment on at least one of the grounds set forth in the notice, we conclude that the court properly rejected the plaintiff's attack on the factual determinations implicitly made by the board.

## II

The plaintiff next claims that the court improperly upheld the decision of the board to terminate his employment because the decision violated public policy, thereby, constituting a wrongful discharge. Specifically, the plaintiff argues that he was wrongfully discharged because his discharge contravened a clear public policy of the state to promote public safety by requiring a building official to ensure full compliance with the building code and to "be free of political or commercial pressures or considerations in rendering his decisions regarding compliance with the building code." In the plaintiff's view, the board's decision to discharge him from his position for the reasons set forth in the notice of charges was pretextual. Instead, the plaintiff attempts to characterize the action of the board as an improper attempt to ensure that the redevelopment of the property was successful and that the property returned to the municipal tax rolls. The plaintiff argues that any dispute about his application of the building code should not have been resolved by the termination of his employment but, instead, addressed through the proper statutory appeal procedures set forth in General Statutes §§ 29-252 (d)[10] and 29-266.[11] We are not persuaded by his public policy claim for the reasons that follow.

At the outset, it is important to note that the plaintiff's public policy claim is rooted doctrinally in two distinct types of cases. First, the plaintiff relies on our Supreme Court's decision in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980). In *Sheets*, a wrongful employment termination case, the court considered whether public policy limits an employer's right to terminate an at-will employee's position where the employee alleges a retaliatory discharge. The plaintiff in *Sheets* alleged that his employer terminated his at-will employment in retaliation for the plaintiff's insistence that the employer adhere to requirements

imposed by a certain food labeling statute. Id., 473. The court was faced with determining whether an "exception to the traditional rules governing employment at will" should be recognized "so as to permit a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy." Id., 474.

The plaintiff's reliance on *Sheets* in maintaining his argument that the board's decision to terminate his employment was illegal and violated public policy is misplaced. The plaintiff in *Sheets* had little protection from an improper discharge because he was an at-will employee. In the present case, the plaintiff is not an at-will employee who can be fired for virtually any reason but instead is protected by the safeguards contained in § 29-260 (b) that permit the termination of his employment if he "fails to perform the duties of his office . . . ." Additionally, the plaintiff enjoyed the protections of a collective bargaining agreement[12] and thus could only be terminated for just cause. " 'Just cause' substantially limits employer discretion to terminate, by requiring the employer, in all instances, to proffer a proper reason for dismissal, by forbidding the employer to act arbitrarily or capriciously." *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 475. Unlike in *Sheets*, in which the court decided to formulate judicial protections for an at-will employee who otherwise would have no recourse when faced with an improper retaliatory discharge; id., 477; the plaintiff in the present case does not need the protection of a public policy exception that prevents an employer from terminating an employee's employment because he already is entitled to the statutory and collective bargaining protections that apply to him.

The plaintiff's public policy claim also is grounded in a second line of authority that permits a reviewing court to overturn a decision of an arbitrator in an employment matter if the arbitrator's decision violates public policy. See, e.g., *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 630–31, 114 A.3d 144 (2015). As we recently stated, "[t]o determine whether an arbitration award must be vacated for violating public policy, we employ a two-pronged analysis. . . . First, we must determine whether the award implicates any explicit, well-defined, and dominant public policy. . . . To identify the existence of a public policy, we look to statutes, regulations, administrative decisions, and case law. . . . Second, if the decision of the arbitrator does implicate a clearly defined public policy, we then determine whether the contract, as construed by the arbitration award, violates that policy." (Internal quotation marks omitted.) *Bridgeport Board of Education* v. *NAGE, Local RI-200*, 160 Conn. App. 482, 491, 125 A.3d 658 (2015). "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific

application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 42, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).

The present appeal, of course, does not arise from an arbitration proceeding involving a consensual resolution of the contractual rights of the parties. Instead, the underlying administrative proceeding is statutorily authorized and governed by the standards and procedures dictated by the legislature in § 29-260. If the board's decision to terminate the plaintiff's employment for failing to discharge the duties of his office was determined by a court to be "illegal" because it violated or undermined the plaintiff's rights or some well established public policy, then the plaintiff would undoubtedly be entitled to a reversal of the board's decision. In other words, the plaintiff's reliance on the arbitration cases is misplaced and, more importantly, unnecessary, because the legislature has authorized a reviewing court to reverse a board's decision if it is "illegal."

The fundamental flaw in the plaintiff's public policy claim is that it lacks the necessary factual predicate,[13] that is, a factual finding by the board or the Superior Court that the town's termination of the plaintiff's employment was pretextual and/or retaliatory. Indeed, if the facts as found by the board, or by the Superior Court pursuant to § 29-260 (c), were that the plaintiff should be terminated from his position because he had performed his duties by raising legitimate issues with town officials about the meaning, application, and enforcement of the building code as it relates to the property, he would be well-placed to assert that his dismissal was illegal.

For the reasons set forth in part I of this opinion, there was substantial evidence before the board to support the plaintiff's discharge on one or more of the grounds set forth in its notice of charges. The facts presented to the board amply supported a conclusion that his dismissal was warranted for failing to discharge the duties of his office. We emphasize that substantial evidence was presented to support a conclusion that the plaintiff had vowed that he would never issue a certificate of occupancy to the company regardless of the company's compliance with the building code. Such conduct squarely falls within the statutorily authorized basis to terminate his employment: a failure "to perform the duties of his office . . . ." General Statutes § 29-260 (b). Consequently, the plaintiff's public policy claim fails for the lack of the necessary factual predicate.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The terms "building official" and "building inspector" are used interchangeably by the parties. We use "building official" throughout this opinion to comport with the language of General Statutes § 29-260.

[2] General Statutes § 29-260 provides in relevant part: "(a) The chief executive officer of any town, city or borough . . . shall appoint an officer to administer the code for a term of four years . . . . Such officer shall be known as the building official. . . .

"(b) Unless otherwise provided by ordinance, charter or special act, a local building official who fails to perform the duties of his office may be dismissed by the local appointing authority . . . provided, prior to such dismissal, such local building official shall be given an opportunity to be heard in his own defense at a public hearing in accordance with subsection (c) of this section.

"(c) No local building official may be dismissed under subsection (b) of this section unless he has been given notice in writing of the specific grounds for such dismissal and an opportunity to be heard in his own defense, personally or by counsel, at a public hearing before the authority having the power of dismissal. Such public hearing shall be held not less than five or more than ten days after such notice. Any person so dismissed may appeal within thirty days following such dismissal to the superior court for the judicial district in which such town, city or borough is located. . . . The court shall review the record of such hearing and if it appears that testimony is necessary for an equitable disposition of the appeal, it may take evidence or appoint a referee or a committee to take such evidence as the court may direct and report the same to the court with his or its findings of fact, which report shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may affirm the action of such authority or may set the same aside if it finds that such authority acted illegally or abused its discretion. . . ."

[3] Although the owner, Hayes, stated in his communications with the plaintiff that the applications were submitted in 2012 and 2013, the record shows they were actually submitted in 2013 and 2014.

[4] Bailey documented his interactions with the plaintiff in numerous memoranda.

[5] Davidson made a handwritten notation on the e-mail sent by the plaintiff that she had not seen a letter at her desk from the plaintiff upon her return to the office on July 6, 2016.

[6] The plaintiff was protected by a collective bargaining agreement with the AFSCME Council 4, Local 818 union. A provision in the collective bargaining agreement provided that the plaintiff could be terminated from his position as a building official only for just cause.

[7] In his brief on appeal, the plaintiff set forth his claims in a different order. For the sake of convenience, we discuss the plaintiff's claims in reverse order.

[8] The Uniform Administrative Procedure Act (UAPA), codified at General Statutes § 4-166 et seq., by its terms does not apply to appeals from municipal administrative agencies. An appeal is governed by the UAPA only if the aggrieved party is appealing a final decision of a "*state* board, commission, department or officer authorized by law to make regulations or to determine contested cases . . . ." (Emphasis added.) General Statutes § 4-166 (1); see also General Statutes § 4-183 (a).

[9] In determining the appropriate standard of review, we decline to rely on municipal land use appeals, as the trial court did here, for a source of those standards of review. Although there may be significant similarities between the standards of review applied in land use cases and other types of appeals from municipal agencies, we recognize that land use proceedings are highly regulated and may involve different standards of review in certain contexts such as affordable housing appeals. See chapter 124 of the General Statutes; compare *Property Group, Inc.* v. *Planning & Zoning Commission*, 226 Conn. 684, 697–98, 628 A.2d 1277 (1993), with *River Bend Associates, Inc.* v. *Zoning Commission*, 271 Conn. 1, 21–25, 856 A.2d 973 (2004).

[10] General Statutes § 29-252 (d) provides: "The State Building Inspector or his designee shall review a decision by a local building official or a board of appeals appointed pursuant to section 29-266 when he has reason to believe that such official or board has misconstrued or misinterpreted any provision of the State Building Code. If, upon review and after consultation with such official or board, he determines that a provision of the code has been misconstrued or misinterpreted, he shall issue an interpretation of said code and may issue any order he deems appropriate. Any such determination or order shall be in writing and be sent to such local building official

or board by registered mail, return receipt requested. Any person aggrieved by any determination or order by the State Building Inspector under this subsection may appeal to the Codes and Standards Committee within fourteen days after mailing of the decision or order. Any person aggrieved by any ruling of the Codes and Standards Committee may appeal in accordance with the provisions of subsection (d) of section 29-266."

[11] General Statutes § 29-266 provides in relevant part: "(a) A board of appeals shall be appointed by each municipality. . . .

"(b) When the building official rejects or refuses to approve the mode or manner of construction proposed to be followed or the materials to be used in the erection or alteration of a building or structure, or when it is claimed that the provisions of the code do not apply or that an equally good or more desirable form of construction can be employed in a specific case, or when it is claimed that the true intent and meaning of the code and regulations have been misconstrued or wrongly interpreted, or when the building official issues a written order under subsection (c) of section 29-261, the owner of such building or structure . . . may appeal in writing from the decision of the building official to the board of appeals. When a person other than such owner claims to be aggrieved by any decision of the building official, such person . . . may appeal, in writing, from the decision of the building official to the board of appeals . . . .

"(c) If, at the time that a building official makes a decision under subsection (b) of this section, there is no board of appeals for the municipality in which the building official serves, a person who claims to be aggrieved by such decision may submit an appeal, in writing, to the chief executive officer of such municipality. If . . . the municipality fails to appoint a board of appeals . . . such officer shall file a notice of such failure with the building official from whom the appeal has been taken and, prior to such filing, mail a copy of the notice to the person taking the appeal. Such person may appeal the decision of the building official to the Codes and Standards Committee . . . . If the municipality succeeds in appointing a board of appeals, the chief executive officer of the municipality shall immediately transmit the written appeal to such board, which shall review the appeal in accordance with the provisions of subsection (b) of this section.

"(d) Any person aggrieved by any ruling of the Codes and Standards Committee may appeal to the superior court for the judicial district where such building or structure has been or is being erected."

[12] "Collective bargaining agreements ordinarily contain provisions prohibiting dismissal without 'cause' or 'just cause' which now serve to protect a significant portion of the work force from groundless dismissal." *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 563–64, 479 A.2d 781 (1984).

[13] Citing *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429 n.7, 747 A.2d 1017 (2000), and other arbitration cases, the plaintiff asserts that this court, in reviewing his public policy claim, should exercise de novo review of the board's decision. We disagree. Although the question of whether an "explicit, well-defined, and dominant public policy" exists is a legal question subject to plenary review; (internal quotation marks omitted) *Bridgeport Board of Education* v. *NAGE, Local RI-200*, supra, 160 Conn. App. 491; the factual question of whether the employer dismissed the employee for a legitimate reason that does not implicate or transgress the identified public policy is subject to more deferential review. In the context of an administrative appeal pursuant to § 29-260, that standard of review invokes the substantial evidence test as described in part I of this opinion.