******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES *v.* DANCE RIGHT, LLC, ET AL.
### (AC 46950)

Bright, C. J., and Suarez and Clark, Js.

*Syllabus*

The plaintiff appealed from the trial court's order remanding its administrative appeal from the decision of its human rights referee, which concluded that the defendant employer had discriminated against its former employee, M, on the basis of her disability but that M failed to establish that she had been constructively discharged. The plaintiff claimed, inter alia, that the court erred by remanding the matter to the referee without sustaining the appeal. *Held*:

The trial court erred in remanding the matter to the referee for an amended decision while retaining jurisdiction over the appeal because, pursuant to statute (§ 4-183), there was no legal basis for the remand, as there was no ambiguity in the referee's decision that required a clarification or an articulation.

The trial court should have dismissed the appeal because there was substantial evidence in the record to support the referee's finding that M failed to prove that she was constructively discharged.

Argued October 16, 2024—officially released January 7, 2025

*Procedural History*

Appeal from the decision of a human rights referee for the plaintiff concluding that the named defendant discriminated against the complainant Amber Frazier Manning but that the complainant Amber Frazier Manning failed to establish that she had been constructively discharged, brought to the Superior Court in the judicial district of New Britain, where the court, *Hon. Henry S. Cohn*, judge trial referee, remanded the matter to the human rights referee for the plaintiff, from which the plaintiff appealed and the named defendant cross appealed; thereafter, the named defendant withdrew its cross appeal. *Reversed*; *judgment directed*.

*Michael E. Roberts*, human rights attorney, for the appellant (plaintiff).

*Kristi D. Kelly*, for the appellee (named defendant).

*Opinion*

CLARK, J. The plaintiff, the Commission on Human Rights and Opportunities (commission), appeals from the order of the trial court remanding its administrative appeal from the decision of the commission's human rights referee (referee).[1] In the administrative proceedings before the commission, the referee found that the defendant Dance Right, LLC (Dance Right), discriminated against the complainant, Amber Frazier Manning, on the basis of her disability by failing to provide her with a reasonable accommodation, but that the complainant failed to establish that she had been constructively discharged.[2] In the commission's administrative appeal, the trial court, following oral argument, issued an order (remand order) in which it determined that the referee's findings with respect to the reasonable accommodation claim conflicted with the finding that Dance Right did not constructively discharge the complainant and remanded the matter to the referee to issue an amended opinion addressing that conflict. On appeal, the commission claims that the trial court erred by (1) remanding the matter to the referee without sustaining the appeal, and (2) failing to conclude that Dance Right's failure to provide the complainant with a reasonable accommodation established, as a matter of law,

---

[1] "Due to unusual procedures applicable to proceedings before the commission, in this administrative appeal, the commission is named as both a plaintiff (in its own capacity) and as a defendant (in its capacity as the agency under which the commission's human rights referee issued the decision from which the commission appealed). See General Statutes § 46a-94a." *Commission on Human Rights & Opportunities* v. *Echo Hose Ambulance*, 322 Conn. 154, 157 n.1, 140 A.3d 190 (2016).

[2] The complainant, who was also named as a defendant, did not file an appearance or otherwise participate in the proceedings before the Superior Court and likewise has not participated in this appeal.

that the complainant was constructively discharged.[3] We agree that the trial court's remand order was improper, but conclude that substantial evidence supported the referee's finding that the complainant was not constructively discharged. Accordingly, we reverse the judgment of the trial court and remand the case with direction to dismiss the commission's appeal.

The following facts, as found by the referee or as otherwise undisputed in the record, and procedural history are relevant to our resolution of this appeal. In or around March, 2014, the complainant was sexually assaulted while volunteering at an anime convention. At the time of the assault, the complainant was employed as an assistant manager at Brookstone in the Westfarms Mall in Farmington. Following the assault, the complainant had difficulty maintaining her performance at work and was terminated from her position in April, 2014. In August, 2014, the complainant was diagnosed with post-traumatic stress disorder (PTSD) as a result of the sexual assault. Shortly thereafter, the complainant began working at the jewelry counter at Sears. During her training, however, the complainant became concerned that it would be difficult to remove herself from her assigned post in the event of a panic attack or other PTSD related episode. In addition, during this time the complainant started experiencing worsening PTSD related symptoms, including panic attacks, loss of appetite, and insomnia. As a result, the complainant left her position with Sears.

Dance Right is a dance studio and franchise of Arthur Murray International. At all times relevant to this case, Dance Right was co-owned by Jonathan Stangel and

---

[3] The commission also claims that the referee improperly found that the complainant failed to mitigate her damages. As the commission concedes, we need not address that claim if we conclude, as we do in this opinion, that substantial evidence supported the referee's finding that the complainant was not constructively discharged.

Jessica Megargle, with Camilla Cazagrande serving as manager. In the fall of 2014, the complainant learned from Cazagrande, who was a friend of hers, that Dance Right was looking for an administrative assistant. On October 24, 2014, the complainant applied for the administrative assistant position and was hired on the same day. On her employment application, in response to a question asking whether she had any condition that might limit her ability to perform the duties of the position, the complainant disclosed her PTSD diagnosis. The complainant was initially hired on a trial basis at a rate of $10.50 per hour. On December 15, 2014, Dance Right agreed to make the complainant a salaried employee and increased her pay to an hourly equivalent of $12.50 per hour.

Dance Right maintained a handbook of policies and procedures primarily directed toward its dance instructors. The only policy in the handbook regarding sexual harassment stated in full: "Under no circumstances will sexually inappropriate behavior or comments be tolerated. Unnecessary actions of this nature will be dealt with in a manner appropriate to state and federal guidelines. If you have encountered sexual harassment, you are required to fill out a written complaint with management immediately so we may protect you." Dance Right did not maintain any written policy regarding disability discrimination or procedures for requesting reasonable accommodations.

As the administrative assistant, the complainant's job duties included, among other things, staffing the reception desk, answering and returning phone calls, confirming client appointments, tracking lessons, and speaking with clients in person and over the phone to ensure their accounts were up to date. One student, Ross White, often would call to ask questions about his lessons and instructors, sometimes calling more than one dozen times in a single day. When at the studio for his

lessons, White would hang out near the reception desk, tell the complainant that she was "beautiful" or "wonderful," and, at times, would stare at her. White, along with other students, also occasionally brought candy, flowers, or dessert foods for the staff members at Dance Right, including the complainant. The complainant told Megargle that White's behavior made her uncomfortable and was having an effect on her PTSD. Megargle told the complainant that she should continue to be polite in her interactions with White and that she should be gracious and accept his gifts. The complainant also told Cazagrande about White's conduct and the effect it was having on her PTSD. In response, Cazagrande told the complainant that White previously had acted inappropriately while Cazagrande was his dance instructor, including an incident in which he unsnapped her bra while dancing. Cazagrande also told the complainant that, after she reported White's behavior, White was reassigned to a different instructor.

On January 17, 2015, Dance Right hosted an evening dance showcase at the Sheraton Hotel in Windsor Locks. At some point during the showcase, one of Dance Right's instructors, Raelynn Hall, reported to Megargle that while she was dancing with White, he grabbed her buttocks while performing a "dip" move. Megargle verbally reprimanded White that evening, and White left the event immediately thereafter. The complainant did not witness the incident, but Hall told her about it later that evening. Hearing about the incident triggered the complainant's PTSD symptoms, causing her to experience anxiety, loss of appetite, and insomnia. Approximately one week after the event, the complainant told Megargle that White's conduct had triggered her PTSD symptoms and asked what action would be taken in response to the incident. Megargle told the complainant that she had reprimanded White at the event and did not think any further action was necessary, but that

White might be asked to leave the studio if he continued engaging in inappropriate conduct. The complainant asked Megargle to provide her with any policies that Dance Right maintained regarding sexual harassment, but no such policy was ever provided.

On February 24, 2015, the complainant was working at the front desk while Hall and another instructor were giving a group dance lesson. Hall approached the complainant and told her that White had just groped her again. Hall told the complainant that, during the lesson, White ran his hand up her side to her breast and then down to the small of her back and her buttocks in a manner that was not appropriate for the dance moves being taught. The complainant did not witness the incident but reported it to Cazagrande, who said she would discuss it with Megargle. Later that evening, the complainant reported the incident to Megargle, who told the complainant that Dance Right would look into the incident and that they had to consider both sides before taking action. In addition, Hall, Cazagrande, and another instructor, Mary Jaqueline Kirchoff, called Stangel to notify him of the incident. Upon learning of the allegations, Stangel commenced an investigation by speaking with Kirchoff, Hall, Cazagrande, and the complainant.

Following the incident, the complainant's PTSD symptoms worsened. She felt that Dance Right was an unsafe environment and feared that she would be exposed to inappropriate sexual conduct without the company taking any action. The complainant discussed the incident and the effect it had on her PTSD with Megargle and Stangel and requested that Dance Right accommodate her by removing White as a student. Stangel told the complainant that he understood her concerns but that he needed more information before summarily removing White from the studio. Stangel and Megargle offered to adjust the complainant's schedule

so she could avoid working during White's lessons.[4] On or around February 26, 2015, Dance Right changed the complainant's pay structure from salary to hourly and reduced her pay to $12 per hour.

During the two weeks following the February 24, 2015 incident, the complainant asked Megargle on multiple occasions for an update on the status of the investigation. The complainant told Megargle that the situation was causing her anxiety and that she would have to resign if White was not asked to leave the studio. Megargle told the complainant that they were still investigating the incident. Megargle testified that, following the February 24, 2015 incident, White did not return to the studio for another lesson until March 10, 2015, and that she spoke with White about the incident that day. Megargle further testified that, after speaking with White, she had to confer with Stangel about what action should be taken regarding the incident.

On March 13, 2015, the complainant wrote a resignation letter to Megargle stating: "I am sorry I have to do this, but I feel I have no other choice. I am leaving [Dance Right] . . . because I feel it is an unsafe work environment and a hostile one. I would not expect anyone to tolerate assault of any kind, especially in the workplace. It sickens and saddens me that it is not dealt with quickly and decisively here at [Dance Right]." Megargle received the complainant's resignation letter the following day, on March 14, 2015. Pursuant to a letter agreement dated March 17, 2015, Dance Right suspended White's lessons effective March 30, 2015, due

---

[4] The referee found that Dance Right's offer to accommodate the complainant by adjusting her schedule "would have resulted in a further loss of pay . . . ." The complainant, however, testified that she "never got any [answer]" about whether adjusting her schedule would affect her pay, and Stangel testified that it was not his intention that the complainant's pay would be reduced if she adjusted her schedule.

to "two recent complaints [from] staff of inappropriate behavior."

On September 8, 2015, the complainant filed a complaint with the commission, alleging that Dance Right discriminated against her on the basis of her PTSD, in violation of General Statutes (Rev. to 2015) § 46a-60 (a) (1),[5] by failing to provide a reasonable accommodation and constructively discharging her. The commission investigated the complaint and, upon finding reasonable cause that a discriminatory practice occurred and that conciliatory efforts had failed, held a contested case hearing pursuant to General Statutes § 46a-84. The hearing was held over the course of five days in November, 2018, after which the parties submitted posthearing briefs.

On June 30, 2022, the referee issued a memorandum of decision. The referee first concluded that Dance Right failed to provide the complainant with a reasonable accommodation. The referee found that the complainant had requested that Dance Right remove White as a student and provide a sexual harassment policy and that "[t]here is no evidence that [Dance Right] seriously considered whether the complainant's proposed accommodations would impose an undue hardship in the

---

[5] General Statutes (Rev. to 2015) § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section . . . (1) [f]or an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need . . . to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . present or past history of mental disability . . . or physical disability . . . ."

The complaint initially alleged discrimination on the basis of a physical disability, but subsequently was amended to add an allegation of discrimination on the basis of a mental disability. The complaint also alleged that Dance Right violated General Statutes § 46a-58 (a), on the basis of a deprivation of rights under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., but that claim was abandoned following the hearing.

particular circumstances of [Dance Right's] studio workplace or would involve significant difficulties or expense." The referee found that Dance Right "established that . . . it was investigating the incident before taking any action to remove White as a customer and was moving forward with that investigation." The referee further found, however, that Dance Right "delayed addressing the complainant's requested accommodations while it [conducted the investigation]" and "did not articulate any reason for not engaging more directly in the interactive process with the complainant in the interim,[6] at a minimum providing the complainant with a requested sexual harassment policy or ameliorating the effect that [White's] presence was having on her PTSD condition." (Footnote added.) The referee also found that, although Dance Right proposed allowing the complainant to flex her schedule to avoid working while White was present, "there was no clarity in how the proposed alternative would work in light of the proposed terms, including a further wage reduction, or how such accommodation would have addressed [the complainant's] underlying concerns."

The referee further concluded, however, that the complainant failed to prove that she had been constructively discharged. The referee found that, "although [Dance Right] was aware that the complainant's PTSD was being triggered, and [was] aware of accommodations [that] she requested, there is no evidence that

[6] "Once a disabled individual has suggested to his employer a reasonable accommodation, [the Connecticut Fair Employment Practices Act (CFEPA), General Statutes § 46a-51 et seq.] requires . . . that the employer and the employee engage in an informal, interactive process with the qualified individual with a disability in need of the accommodation . . . [to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. . . . In this effort, the employee must come forward with some suggestion of accommodation, and the employer must make a good faith effort to participate in that discussion." (Citation omitted; internal quotation marks omitted.) *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 416, 944 A.2d 925 (2008).

the respondent intentionally created the complained of work atmosphere." The referee further explained that "[a] claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign" and found that "[n]o such evidence has been presented here." (Internal quotation marks omitted.) On the basis of those findings, the referee determined that "[t]he complainant failed to establish a prima facie case of constructive discharge by showing that [Dance Right] intentionally created the complained of work atmosphere, and that the work atmosphere was so difficult or unpleasant that a reasonable person in the complainant's shoes would have felt compelled to resign."

On the basis of the determination that Dance Right had not constructively discharged the complainant, the referee found that the complainant voluntary resigned and, therefore, was not entitled to back pay.[7] The referee ordered Dance Right to "cease and desist from all acts of discrimination prohibited under federal and state law" and to post certain notices provided by the commission, but declined to award the complainant back pay damages.

On August 8, 2022, the commission timely appealed the referee's decision to the Superior Court. In its brief

[7] Alternatively, the referee found that, even if the complainant had been constructively discharged, she "affirmatively chose not to seek or apply for new employment in mitigation of her potential damages." Specifically, the referee found that, following her resignation, the complainant did not seek new employment or apply for unemployment compensation because she and her husband had "resolved that he would support them both financially through his job while she would work to maintain the household." As noted previously; see footnote 3 of this opinion; although the commission challenged the referee's determination that the complainant failed to mitigate her damages, we need not address that issue in light of our conclusion that there was substantial evidence to support the referee's finding that the complainant was not constructively discharged.

to the Superior Court, the commission claimed that the referee's determination that the complainant had not been constructively discharged conflicted with her conclusion that Dance Right had failed to provide the complainant with a reasonable accommodation. Specifically, the commission contended that the referee's conclusion that Dance Right failed to provide the complainant with a reasonable accommodation, and the factual findings underlying that conclusion, established as a matter of law that Dance Right constructively discharged the complainant. Dance Right argued that the court should dismiss the appeal because the evidence in the record supported the referee's finding that there was no constructive discharge.

On September 11, 2023, following briefing and oral argument, the court issued the remand order, in which it found "that there [was] a conflict between the referee's findings of fact and the referee's conclusion that there was no objective ground for a finding of constructive discharge or awarding of damages therefor." Quoting paragraph 93 of the referee's findings of fact (finding 93), the court further stated: "To illustrate, the referee found that '[Dance Right] was aware that the situation [following the February 25, 2015 incident] was causing the complainant anxiety, to the point where if no action was taken, the complainant would have no choice but to leave.' " Nevertheless, the court did not sustain the appeal but, rather, remanded the matter to the referee "for an amended opinion on this point and consideration of damages, if appropriate."

On September 13, 2023, the commission moved for reconsideration of the remand order. The commission argued that, in finding that there was a "conflict" between the referee's factual findings regarding the reasonable accommodation claim and the determination that the complainant had not been constructively discharged, the court had agreed with "the crux of the

. . . [c]ommission's claim of error on the issue of constructive discharge." The commission further contended that this "conflict" was not an ambiguity that required clarification but, rather, was a legal error that required the court to sustain the appeal. On September 21, 2023, the court issued an order denying the motion for reconsideration, which stated that the remand order had directed the referee "to clarify whether [the complainant] was constructively discharged when Dance Right failed to accommodate her . . . [and] to award her damages if appropriate" and that "[s]uch . . . clarification may be appealed subsequently to the court as part of the already pending administrative appeal." This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The commission first claims that the court erred in remanding the matter to the referee for an amended decision while retaining jurisdiction over the appeal.[8]

---

[8] On March 5, 2024, this court, sua sponte, ordered the parties to address in their briefs whether the remand order was an appealable final judgment because it was "a remand authorized by General Statutes § 4-183 (j)" or "an otherwise interlocutory order that satisfies the test for finality articulated in *State* v. *Curcio*, 191 Conn. 27, 31 [463 A.2d 566] (1983)," or, alternatively, "whether [the] appeal must be dismissed for lack of a final judgment." We conclude that the court's remand order is immediately appealable under the second prong of the finality test set forth in *State* v. *Curcio*, supra, 31, because it "so concludes the rights of the parties that further proceedings cannot affect them."

As the commission argues in its brief, the commission had a statutory right to obtain judicial review of the final decision of the referee. See General Statutes § 46a-94a (a) (providing right to appeal referee's decision "in accordance with [§] 4-183"). As we discuss subsequently in this opinion, the remand order, as supplemented by the order denying the motion for reconsideration, required the referee to issue an amended decision that, at a minimum, would have altered the referee's analysis with respect to the constructive discharge claim. The remand order further provided that any further proceedings in the trial court would be based on the amended decision. Accordingly, we conclude that the remand order so concluded the commission's right to obtain judicial review of the final decision that further proceedings could not affect that right.

The commission contends that, because there was no ambiguity in the referee's decision that required a clarification or articulation, there was no basis for the court to remand the matter to the referee while retaining jurisdiction over the appeal. We agree.

We begin by setting forth the standard of review and legal principles applicable to this claim. The commission's claim that the court lacked the authority to issue the remand order is a question of law subject to plenary review. See, e.g., *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 239–40, 796 A.2d 1164 (2002) ("Whether the trial court had the power to issue [an] order, as distinct from the question of whether the trial court properly exercised that power, is a question involving the scope of the trial court's inherent powers and, as such, is a question of law. . . . Accordingly, our review is plenary." (Citation omitted.)). Likewise, "[t]o the extent the present claim requires us to interpret the trial court's order . . . our review is also plenary." *Glory Chapel International Cathedral* v. *Philadelphia Indemnity Ins. Co.*, 224 Conn. App. 501, 512, 313 A.3d 1273 (2024).

Judicial review of a decision of the commission is governed by the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. See General Statutes § 46a-94a (a). This court has recognized three circumstances under the UAPA in which a court is authorized to remand an administrative appeal to the agency. See *Connecticut Light & Power Co.* v. *Public Utilities Regulatory Authority*, 223 Conn. App. 136, 143–45, 307 A.3d 967 (2023).

First, General Statutes § 4-183 (j) provides in relevant part that a court in an administrative appeal "shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings,

inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k)[9] of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment." (Footnote added.) Because a remand pursuant to § 4-183 (j) is a final judgment; see *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 675–76, 855 A.2d 212 (2004); the court does not retain jurisdiction following a remand issued pursuant to subsection (j).

Second, § 4-183 (h) provides that, "[i]f, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court." Although § 4-183 (h) does not

---

[9] General Statutes § 4-183 (k) provides: "If a particular agency action is required by law, the court, on sustaining the appeal, may render a judgment that modifies the agency decision, orders the particular agency action, or orders the agency to take such action as may be necessary to effect the particular action."

expressly refer to a remand, our Supreme Court "[has] recognized that orders under subsection (h) fairly may be characterized as remands." *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 558, 964 A.2d 1213 (2009). Because § 4-183 (h) contemplates that the parties will return to the Superior Court for judicial resolution of the appeal after the agency takes additional evidence, the court retains jurisdiction pending a remand pursuant to that subsection.

Third, this court recognized in *Commission on Human Rights & Opportunities* v. *Hartford*, 138 Conn. App. 141, 153–54, 50 A.3d 917, cert. denied, 307 Conn. 929, 55 A.3d 570 (2012), that the court has the authority to remand an administrative appeal to the agency for an articulation, while retaining jurisdiction over the appeal. We explained that, "[a]lthough the plain text of § 4-183 expressly refers to remands only in subsection (j) and implicitly refers to remands in subsection (h), it does not state that the types of remands addressed in § 4-183 constitute an exhaustive list despite the legislature's knowledge of how to express such an intent." (Footnote omitted.) Id., 153. We further observed that "[r]eviewing courts typically have the ability to obtain articulations from the tribunals whose decisions they review." Id., 153–54.[10]

In the present case, the remand did not fall within any of the circumstances described in the preceding paragraphs for which a remand is authorized. Although

[10] The commission argues that *Commission on Human Rights & Opportunities* v. *Hartford*, supra, 138 Conn. App. 141, was wrongly decided and that we should conclude that judges of the Superior Court lack the authority to order articulations of an agency's decision. In light of our conclusion that the remand order was not an order for an articulation, we need not address that claim. In any event, as this court recently noted in response to an identical claim, "[i]t is well established . . . that one panel of this court cannot overrule the precedent established by a previous panel's holding." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Public Utilities Regulatory Authority*, supra, 223 Conn. App. 148 n.9.

the order denying the commission's motion for reconsideration indicates that the court considered the remand to be for an articulation, the remand order authorized the referee to modify her legal conclusions and issue additional orders, which is not permissible in an articulation. "An articulation is appropriate where the [tribunal's] decision contains some ambiguity or deficiency reasonably susceptible of clarification," but it "is not an opportunity for a [tribunal] to substitute a new decision [or] to change the reasoning or basis of a prior decision." (Internal quotation marks omitted.) *Walshon* v. *Walshon*, 42 Conn. App. 651, 655–56, 681 A.2d 376 (1996); see also *Sosin* v. *Sosin*, 300 Conn. 205, 240, 14 A.3d 307 (2011) ("a trial court may not alter its initial findings by way of a further articulation" (internal quotation marks omitted)). Moreover, "[a]n articulation presupposes ambiguity or incompleteness in the legal reasoning of the [tribunal] in reaching its decision." (Internal quotation marks omitted.) *In re Jason R.*, 129 Conn. App. 746, 763, 23 A.3d 18 (2011), aff'd, 306 Conn. 438, 51 A.3d 334 (2012); see, e.g., *Connecticut Light & Power Co.* v. *Public Utilities Regulatory Authority*, supra, 223 Conn. App. 147–48 and n.8 (remand order constituted order for articulation because it "required [the agency] to clarify the bases for its decision," and agency's decision filed in compliance with remand "[did] not modify, in any way, the conclusions of [the agency] or the orders in the final decision" (internal quotation marks omitted)); *Commission on Human Rights & Opportunities* v. *Hartford*, supra, 138 Conn. App. 153–54 (order remanding matter for referee to issue clarification regarding specific issues that court found to be unclear in referee's decision was order for articulation).

Here, the referee's decision was neither ambiguous nor incomplete. Although the order denying the motion

for reconsideration characterized the remand as requiring the referee "to clarify whether [the complainant] was constructively discharged," the referee unambiguously found that "[t]he complainant failed to establish a prima facie case of constructive discharge . . . ." Additionally, the referee found that the complainant was not entitled to damages, but the remand order directed the referee to "[consider] . . . damages, if appropriate." Thus, the remand order did not merely instruct the referee to clarify an ambiguity. Rather, the remand order required, at a minimum, that the referee "change the reasoning or basis of [the] prior decision"; *Walshon* v. *Walshon*, supra, 42 Conn. App. 656; and contemplated that the referee might reach a different legal conclusion with respect to the constructive discharge claim and issue additional orders beyond those included in the final decision.[11] This was not a permissible use of an articulation.

The remand order also was not authorized by § 4-183 (j). As discussed previously, § 4-183 (j) authorizes the court to remand an administrative appeal to the agency for further proceedings after sustaining the

[11] The transcript of the argument on the merits of the administrative appeal further supports our conclusion that the remand was not for an articulation. During the argument, the court asked the parties whether the matter should be remanded for the referee to "review or reissue her opinion, [taking] into account the conflicting portions of the findings of fact vis-à-vis the finding of no constructive discharge . . . ." In explaining the purpose of such a remand, the court stated that the referee "might have . . . the option of deciding whether or not that inconsistency can be resolved. In doing that, she still wouldn't have to issue any ruling on damages *or she might say . . . that I've changed my view, there is a constructive discharge and I'm going to issue damages.*" (Emphasis added.) Later in the hearing, the court asked counsel for Dance Right: "[W]ouldn't you like [the referee] to look at [the] facts and say, oh, all that's going on here is a failure to accommodate and this two week period is too short . . . ? . . . Then you wouldn't have the problem at all. . . . Or maybe the [referee] looking at this would . . . come out entirely differently and they'd say, not only was it a failure to accommodate here but there was a lot going on here . . . that should be cleared up here one way or another."

appeal on the basis of a finding that the "substantial rights of the person appealing have been prejudiced" for one of the six reasons delineated in that subsection. Here, the court did not sustain the appeal or make a finding that the commission was prejudiced for one of the reasons delineated in § 4-183 (j). On the contrary, in its order denying the motion for reconsideration, the court made clear that it intended to retain jurisdiction over the appeal pending the remand, stating that the "clarification [issued by the referee in compliance with the remand order] may be appealed subsequently to the court as part of the *already pending administrative appeal.*" (Emphasis added.) The court's intention to retain jurisdiction pending the remand indicates clearly that the remand order was not issued pursuant to § 4-183 (j). See, e.g., *Commission on Human Rights & Opportunities* v. *Hartford*, supra, 138 Conn. App. 153 (concluding that "remand order was not issued under subsection (j) [of § 4-183]" in part because "the court indicated its intention to retain jurisdiction"); cf. *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 558 and n.7 (concluding that remand order was issued pursuant to § 4-183 (j) where "there [was] nothing in the record to suggest that the trial court intended to retain jurisdiction while the hearing officer reconsidered its decision [in accordance with the remand order]").

Finally, the remand order was not issued pursuant to § 4-183 (h) because neither party moved for leave to present additional evidence before the referee, and the court did not order the referee to take additional evidence on remand. See *Wakefield* v. *Commissioner of Motor Vehicles*, 90 Conn. App. 441, 443, 877 A.2d 1 (remand pursuant to § 4-183 (h) permits party to present additional evidence before agency upon demonstration "that the additional evidence is material and that there are good reasons for the failure to present it in the

proceeding before the agency"), cert. denied, 275 Conn. 931, 883 A.2d 1253 (2005).

Because there was no legal basis for the court to remand the matter to the referee for the purposes stated in its remand order while retaining jurisdiction over the appeal, we conclude that the court erred in remanding the matter to the referee for an amended opinion.

II

Having concluded that the trial court improperly remanded the case to the referee, we turn to the commission's challenge to the referee's finding that the complainant failed to prove that she was constructively discharged. The commission claims that the court erred in failing to sustain its appeal on the basis that the referee's conclusion that Dance Right failed to provide the complainant with a reasonable accommodation established, as a matter of law, that Dance Right constructively discharged the complainant. Dance Right argues that there was substantial evidence in the record to support the referee's finding that the complainant failed to prove her constructive discharge claim and, therefore, that the court should have dismissed the appeal. We agree with Dance Right.[12]

---

[12] We note that, because Dance Right argues that this court should reverse the court's judgment with direction to dismiss the commission's administrative appeal, it should have pursued its claim by way of a cross appeal. See *Mitchell* v. *Silverstein*, 67 Conn. App. 58, 60 n.5, 787 A.2d 20 (2001) ("[i]f an appellee wishes to change the judgment in any way, the party must file a cross appeal" (internal quotation marks omitted)), cert. denied, 259 Conn. 931, 793 A.2d 1085 (2002). Although Dance Right did file a cross appeal challenging the trial court's remand order, it subsequently withdrew that appeal. Notwithstanding this procedural defect, we exercise our discretion to address Dance Right's claim because it is intertwined with our resolution of the commission's appeal, the issue was preserved before the trial court and fully briefed and argued by both parties on appeal to this court, and the parties agreed that this court can and should decide this issue. See *DeBeradinis* v. *Zoning Commission*, 228 Conn. 187, 198 n.7, 635 A.2d 1220 (1994) (exercising discretion to address claim that should have been raised by way of cross appeal "[b]ecause the issue has been fully briefed and it appears that the parties will not be prejudiced"). Moreover, because "the

We begin by setting forth the standard of review and legal principles that guide our resolution of this claim. "It is well established that [j]udicial review of [an administrative agency's] action is governed by the [UAPA] . . . and the scope of that review is very restricted." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon*, 207 Conn. App. 668, 672, 263 A.3d 887 (2021), aff'd, 347 Conn. 58, 295 A.3d 919 (2023). "Review of an appeal taken from the order of an administrative agency such as the [commission] is limited to determining whether the agency's findings are supported by substantial and competent evidence and whether the agency's decision exceeds its statutory authority or constitutes an abuse of discretion. . . . [E]vidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Citation omitted; internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, 212 Conn. App. 578, 586, 276 A.3d 447, cert. denied, 345 Conn. 902, 282 A.3d 466 (2022). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . Ultimately, [t]he question is not whether the [reviewing] court would have reached the same conclusion but whether the record before the [agency] supports the action taken." (Citation omitted; internal quotation marks omitted.) *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, 347 Conn. 241, 247, 297 A.3d 167 (2023).

scope of the trial court's review of the [referee's] decision and the scope of our review of that decision are the same"; (internal quotation marks omitted) *Commissioner of Correction* v. *Freedom of Information Commission*, 307 Conn. 53, 63 n.15, 52 A.3d 636 (2012); remanding the case for the trial court to address the issue in the first instance would serve only to further delay resolution of the matter underlying this appeal.

"Normally, an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge [under the CFEPA]. . . . Through the use of constructive discharge, the law recognizes that an employee's voluntary resignation may be, in reality, a dismissal by an employer. . . . Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 178, 717 A.2d 1254 (1998).

"To plead a prima facie case of constructive discharge, a plaintiff must allege that (1) the employer intentionally created the complained of work atmosphere, (2) the work atmosphere was so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (3) the plaintiff in fact resigned." *Karagozian* v. *USV Optical, Inc.*, 335 Conn. 426, 430, 238 A.3d 716 (2020). "The standard contains a subjective inquiry (did the employer intend to create the working condition) and an objective inquiry (the impact the working conditions would have on a reasonable person)." Id., 443. "[A] claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign." (Internal quotation marks omitted.) *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 178. Rather, the intolerability requirement requires proof that "the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." *Suarez* v. *Pueblo International, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000).[13] "In other

[13] "We look to federal law for guidance in interpreting state employment discrimination law, and analyze claims under [the CFEPA] in the same

words, work conditions must have been so intolerable that [the employee's] decision to resign was void of choice or free will—that her only option was to quit." (Internal quotation marks omitted.) *Equal Employment Opportunity Commission* v. *Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014); accord *Brittell* v. *Dept. of Correction*, supra, 179 ("[h]ad the plaintiff established that she was given the choice either to continue working [under the same discriminatory conditions] or to leave the employ of the defendant, she might well have prevailed on [the intolerability] element of her claim").

On appeal, the commission argues that an employer's failure to provide an employee with a reasonable accommodation may establish both the subjective and objective elements of a constructive discharge claim as a matter of law. During oral argument before this court, however, the commission clarified that it is not claiming that a failure to provide a reasonable accommodation always amounts to a constructive discharge. Rather, the commission argues that if an employee requests a reasonable accommodation and puts the employer on notice that she will resign if the employer does not provide that accommodation, the employer's failure to provide the accommodation within a reasonable period of time establishes a constructive discharge as a matter of law.

The commission's argument ignores two important principles applicable to a constructive discharge claim. First, "[t]he existence of constructive discharge is an issue of fact to be resolved by the [fact finder], and judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation."

manner as federal courts evaluate federal discrimination claims." (Internal quotation marks omitted.) *Karagozian* v. *USV Optical, Inc.*, supra, 335 Conn. 438 n.5.

*Strickland* v. *United Parcel Service, Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009); see also *Green* v. *East Haven*, 952 F.3d 394, 405 (2d Cir. 2020) ("that this substantive standard is an objective one . . . does not necessarily mean that what a reasonable person in the plaintiff's shoes would have felt compelled to do is determinable as a matter of law, for an objective question is often fact-specific"). As noted previously, under the UAPA, judicial review of an agency's factual determination is governed by the substantial evidence standard, which "is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review."[14] (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Hartford*, supra, 138 Conn. App. 149. Under the substantial evidence standard, "[t]he question is not whether the evidence would also support a different, or even inconsistent conclusion but whether there is substantial evidence to support the [referee's] decision . . . ." (Citation omitted.) *Woodbridge Newton Neighborhood Environmental Trust* v. *Connecticut Siting Council*, 349 Conn. 619, 645, 321 A.3d 363 (2024).

Second, although Connecticut courts have not addressed the issue, other courts—including the United States Supreme Court—have held that where an

---

[14] During oral argument before this court, the commission argued that the constructive discharge determination is a mixed question of law and fact subject to plenary review. See, e.g., *Crews* v. *Crews*, 295 Conn. 153, 163, 989 A.2d 1060 (2010) ("[i]t is settled that [q]uestions of law and mixed questions of law and fact receive plenary review" (internal quotation marks omitted)). The commission, however, has not cited any authority for that proposition. Moreover, in *Brittell*, the Supreme Court concluded that, "[i]n light of the fact-bound nature of determinations regarding the efficacy of an employer's response to illegal harassment by one or more of its employees . . . a clearly erroneous standard is appropriate for our review of the trial court's findings." *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 165. Accordingly, pursuant to § 4-183 (j), we review the referee's factual determination that the complainant was not constructively discharged under the substantial evidence standard.

employee claims that she was constructively discharged on the basis of a discriminatory employment environment, "[u]nless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." (Internal quotation marks omitted.) *Pennsylvania State Police* v. *Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004), quoting *Perry* v. *Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997); see *Equal Employment Opportunity Commission* v. *Sears, Roebuck & Co.*, 233 F.3d 432, 440–41 (7th Cir. 2000) (same); see also *Poland* v. *Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) ("constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer" (internal quotation marks omitted)). Courts have "set the bar high for a claim of constructive discharge because . . . antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland* v. *Chertoff*, supra, 1184; see also *McKelvey* v. *Secretary of United States Army*, 450 Fed. Appx. 532, 535 (6th Cir. 2011) ("[constructive discharge] test deliberately sets a high bar, as the law generally expects employees to remain on the job while pursuing relief from harassment" (internal quotation marks omitted)); *Johnson* v. *Shalala*, 991 F.2d 126, 131 (4th Cir. 1993) (rejecting claim that failure to accommodate necessarily constitutes constructive discharge, in part because "once the employment relationship has terminated, the parties may harden their positions and become unable to resolve their dispute," and noting

that "[i]t is far better for all concerned to resolve the dispute while the employment relationship is ongoing"), cert. denied, 513 U.S. 806, 115 S. Ct. 52, 130 L. Ed. 2d 12 (1994).

In the present case, there is substantial evidence in the record to support the referee's finding that the complainant's work conditions were not so intolerable that a reasonable person in her position would have felt compelled to resign. Although the referee found Dance Right's handling of the complainant's accommodation request to be lacking for purposes of her reasonable accommodation claim, there is a substantial basis in the record from which the referee also reasonably could have determined that the complainant did not face such pervasive discrimination that a reasonable person in her position would have felt she had no choice but to resign.

As discussed previously, the incident that led to the complainant's request for White to be removed from the studio occurred on February 24, 2015, and the complainant resigned seventeen days later, on March 13, 2015. The referee found that, "[u]pon hearing about the February 24, 2015 incident, Stangel commenced an investigation into the incident by speaking with Hall and Kirchoff within a day or two of hearing about the complaint" and that "Stangel interviewed Cazagrande and the complainant [about the incident] on or about February 26, 2015." The referee further found that Stangel did not refuse the complainant's request that White be removed from the studio, but "told the complainant he understood her concerns but needed more information before removing a student from the studio summarily" and offered the complainant "the option of arranging [her] schedule to avoid her working during a time when White had lessons." Moreover, the record reflects that Dance Right was open to considering alternative arrangements that would have accommodated

the complainant; specifically, Stangel testified that, even when the complainant rejected the offer to flex her schedule, he asked the complainant "to think on it and respond with something that she felt would have been more fair," but that the complainant never followed up on that conversation.

Moreover, the evidence reflects that, after the February 24, 2015 incident, White did not return to the studio again until March 10, 2015. Megargle testified that she spoke with White about the incident on the day he returned and that White denied that he purposely groped Hall. Megargle further testified that she then had to confer with Stangel because he had interviewed the other witnesses. The record does not reflect the specific date on which Megargle conferred with Stangel. Stangel testified, however, that the decision to suspend White's lessons was made two or three days before the March 17, 2015 agreement formally suspending White from the studio, following a meeting at which Cazagrande advocated for removing White on the basis of the impact his actions had on the complainant.

Thus, the evidence reflects that less than three weeks passed from the time the incident occurred, on February 24, 2015, to the time Dance Right decided to suspend White's lessons. The evidence also reflects that White was present in the studio on only one occasion during that time period, and there is no evidence that the complainant was forced to have any further interaction with him during that time. Moreover, the referee found that, when the complainant inquired during that time period about what Dance Right intended to do about her concerns, Megargle informed the complainant that Dance Right was still investigating the situation. On the basis of the foregoing, we conclude that there was substantial evidence in the record to support the referee's finding that the complainant failed to prove that a reasonable

person in her position would have felt compelled to resign.[15]

The commission has not cited a single case in which a court has held that an employer's failure to provide a reasonable accommodation established a constructive discharge claim as a matter of law. In its principal appellate brief, the commission relies on certain federal court decisions holding that, under the factual circumstances presented in those cases, evidence regarding an employer's failure to provide an accommodation was sufficient to permit a finding that the employee had been constructively discharged.[16] Under the substantial evidence standard, however, "[t]he question before us is not whether

---

[15] Because we conclude that there was substantial evidence to support the referee's finding that the complainant failed to satisfy the objective component of her constructive discharge claim, we need not address whether the evidence was sufficient to support the referee's finding that the complainant failed to establish the subjective component of her claim. See *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 179 ("[e]ven if we assume, arguendo, that an employer's failure to remedy a hostile working environment may be considered the intentional creation of an intolerable work atmosphere . . . the plaintiff has not met her burden of establishing an essential element of her claim, namely, the existence of an intolerable work atmosphere that would compel a reasonable person in that situation to resign" (citation omitted; emphasis omitted)).

[16] We note that the cases on which the commission relies involved either an outright refusal to accommodate or a failure to respond to the employee's request for an accommodation. See *Johns* v. *Brennan*, 761 Fed. Appx. 742, 745–46 (9th Cir. 2019) (reversing district court's order granting motion for summary judgment for employer because evidence that employer repeatedly refused or failed to communicate with employee about accommodation request and failed to respond to her inquiries during five month period about returning to work with accommodation was sufficient for jury to conclude that working conditions were so intolerable that reasonable person would feel compelled to resign); *Talley* v. *Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109, 1111 (6th Cir. 2008) (reversing district court's order granting motion for summary judgment for employer because evidence that employer refused to read employee's doctor's note, meet with employee to discuss accommodation request, or offer alternative accommodation was sufficient to survive summary judgment); *Smith* v. *Henderson*, 376 F.3d 529, 536–39 (6th Cir. 2004) (reversing district court order granting motion for summary judgment for employer because evidence that employer refused to honor previous accommodation restricting employee's schedule and "flatly denied"

[the] evidence [in the record] compelled the conclusion reached by the [referee] or whether a different fact finder reasonably could have reached a different conclusion. Rather, the question is whether the evidence provides any substantial basis of fact from which the fact in issue reasonably could have been inferred." (Emphasis omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 125–26, 830 A.2d 1121 (2003). Thus, the question for this court is not whether there was sufficient evidence from which the referee could have reached a different conclusion, but whether there is a substantial basis in the evidence to support the referee's determination.

Lastly, to the extent the trial court construed the referee's finding 93 to mean that the referee had found that the complainant objectively had no choice but to resign, that interpretation is contradicted by the evidence cited by the referee in support of that finding. As noted previously, in the remand order, the court determined that the referee's finding that the complainant had not been constructively discharged was in conflict with finding 93 of the referee's memorandum of decision, in which the referee found that "Megargle was aware that the situation was causing the complainant anxiety, to the point where if no action was taken, the complainant would have no choice but to leave."

In support of finding 93, the referee cited Dance Right's answer to the complaint, in which Megargle (on

request for alternative accommodation was sufficient to survive summary judgment).

As discussed previously, Dance Right did not ignore the complainant's request for an accommodation or refuse to comply with her request. Although the referee found that Dance Right failed to reasonably accommodate the complainant's PTSD when it failed to engage more directly with the complainant or take ameliorative action while it investigated whether to remove White from the studio, that conduct does not amount to a complete failure to accommodate like the conduct at issue in the cases cited by the commission.

behalf of Dance Right) stated that "the complainant [told] me [that] the situation adversely affected her including that she would have to leave if [White] was not asked to leave." Later in the memorandum of decision, the referee cited *Brittell* for the proposition that "[a] claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign"; (internal quotation marks omitted) *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 178; and determined that the complainant failed to establish "that the work atmosphere was so difficult or unpleasant that a reasonable person in the complainant's shoes would have felt compelled to resign." In light of the totality of the referee's findings, it would be unreasonable to construe finding 93 as a finding by the referee that the complainant objectively had no choice but to resign. Rather, construing the evidence in the light most favorable to sustaining the referee's decision, the more reasonable interpretation is that the referee found that Megargle was aware that the complainant *subjectively* believed that she would have to resign if Dance Right did not comply with her request to remove White from the studio. As explained previously, however, a complainant's subjective belief regarding the intolerability of the working conditions alone is insufficient to support a constructive discharge claim.

On the basis of the foregoing, we conclude that there was a substantial basis in the evidence to support the referee's finding that the complainant failed to establish that she was constructively discharged and, therefore, that the trial court should have dismissed the administrative appeal.

The judgment is reversed and the case is remanded with direction to dismiss the administrative appeal.

In this opinion the other judges concurred.